SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                )  Arizona Supreme Court
                                    )  No. CR-04-0074-AP
                Appellee, )
                                    )  Maricopa County
            v.              )  Superior Court
                                    )  No. CR 2001-009124
STEVEN RAY NEWELL,           )
                                    )  **O P I N I O N**
                Appellant. )
                                    )
_____)

Appeal from the Superior Court in Maricopa County
The Honorable Barry C. Schneider, Judge

**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL             Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
          Donna J. Lam, Assistant Attorney General     Tucson
Attorneys for the State of Arizona

SUSAN M. SHERWIN, MARICOPA COUNTY LEGAL ADVOCATE     Phoenix
     By   Ginger Jarvis, Deputy Legal Advocate
Attorneys for Steven Ray Newell

_____

**R Y A N**, Justice

**I**

¶1        On the morning of May 23, 2001, eight-year-old Elizabeth Byrd left home for school. She was wearing her school uniform and carrying a purse or knapsack with long straps. Around 7:45 a.m., a neighbor saw Elizabeth walking toward school with Steven Ray Newell following closely behind. Elizabeth knew

Newell because he had previously dated her sister, and the neighbor knew both Elizabeth and Newell.

¶2        About an hour later, a Salt River Project ("SRP") employee working in a field near the M.C. Cash Elementary School came upon someone standing in an irrigation ditch. Based on past experience, the employee initially thought that the person was using something to back up the water in the ditch so he could bathe. As the employee approached the area, the person in the ditch turned and looked at him for about thirty seconds and then jumped up and ran up the bank, disappearing behind some bushes. The employee noticed a rolled up piece of green indoor-outdoor carpeting in the water near where he had seen the person standing, but he did not retrieve it.

¶3        That afternoon, Elizabeth's mother arrived home to find that Elizabeth had not returned from school. This did not concern her, however, because Elizabeth routinely went directly from school to a friend's house, where she would stay until around eight in the evening. When Elizabeth did not come home at eight, her family began to worry. Elizabeth's sisters began looking for her, which is when they learned that she had not been at her friend's house. Around eleven in the evening, because the family still had not found Elizabeth, the police were called.

¶4        Phoenix police responded to the family's call.  After the officers spoke with Elizabeth's mother, they spoke with two of Elizabeth's friends.  The officers were told that Elizabeth had not been in school that day; a missing persons report was then called in.

¶5        The next morning, two members of the Phoenix Police Department were dispatched to search the field near the M.C. Cash Elementary School.  The officers discovered a child's denim shoe, a children's book, a black purse or knapsack containing a cherub magnet with the name "Elizabeth" on it, a pair of socks, and a drawstring coin purse.  That afternoon, a detective from the Maricopa County Sheriff's Office discovered Elizabeth's body in an irrigation ditch in the field, rolled up in green indoor-outdoor carpeting.  Shoe prints were found along the ditch near where Elizabeth's body was found.

¶6        Later that day, the SRP employee went to the Sheriff's office after seeing a news report about the investigation.  He described the person he had seen in the irrigation ditch.  The investigators used that description to create a composite sketch of the suspect.  The employee was also shown a photographic lineup, but he did not identify anyone in the lineup as the person he had seen in the ditch.[1]

---

[1]    The SRP employee was shown multiple photo-lineups over the next two weeks, with each lineup containing a different suspect.

- 3 -

¶7     The Maricopa County Medical Examiner's Office conducted an autopsy on Elizabeth's body the following day. The autopsy revealed bruising on the tops of Elizabeth's hands, wrists, and forearms, which were consistent with an injury caused by her hands being squeezed. A ligature was still tied around Elizabeth's neck. There were small vertical abrasions on the left side of Elizabeth's neck, consistent with fingers grasping at the ligature trying to remove it. She had further bruising under her chin and on her left temple, along with an abrasion near her right eye. The injuries that caused these bruises occurred before or around the time of Elizabeth's death.

¶8     The autopsy also revealed evidence of penetration of Elizabeth's vulva to the hymen consistent with a sexual assault. Elizabeth's vulva was bruised, and the vaginal tract had abrasions, with a tear on the left side of one of the abrasions. One abrasion in the vaginal tract went right up to the hymen, but the hymen itself was still intact.

¶9     The medical examiner concluded that Elizabeth died from asphyxiation due to ligature strangulation. Once the ligature had been tightened, Elizabeth likely died within a minute or two. The medical examiner further determined that it was likely that Elizabeth had stopped breathing before she was

He did not identify anyone in the lineups as the person he had seen in the irrigation ditch until June 5, 2001.

- 4 -

placed in the water because his examination did not reveal any "froth or foaminess" in Elizabeth's airways "and the lungs were not excessively heavy" from the presence of water. Elizabeth's stomach also contained no water.

¶10 At the time of the autopsy, Elizabeth's underwear, along with blood, bone, and tissue samples from Elizabeth, were collected. These items were subsequently sent to the Department of Public Safety ("DPS") lab for testing.

¶11 Because Newell had dated Elizabeth's sister, a detective from the Maricopa County Sheriff's Office contacted Newell on May 27, 2001, to come to the station to be interviewed; Newell agreed. Newell, like the many people from Elizabeth's neighborhood who were interviewed regarding Elizabeth's disappearance, was not a suspect at the time of the initial interview. During this interview, Newell was asked about the day of Elizabeth's disappearance and if he knew anything that might be helpful to the investigation. Newell described what he did that day but made no incriminating statements; at the end of the interview, the detective told him he was free to leave.

¶12 Newell was contacted again by a Sheriff's detective at Elizabeth's funeral on June 2, 2001. The detective went to the funeral to find Newell because he had been told that Newell was wearing Converse All Star shoes, the type of shoes which matched

the shoe prints found near Elizabeth's body. Newell voluntarily went to the station and again answered questions related to his activities around the time of Elizabeth's disappearance. During the interview, Newell's shoes were taken to be compared with the footprints observed at the ditch. Again, Newell was permitted to leave. Two days later, an analyst from the Sheriff's office concluded that it was "highly probable" that the footprints at the crime scene had been made by Newell's shoes.

¶13 On the evening of June 4, two Maricopa County Sheriff's detectives contacted Newell and asked if he would consent to another interview. Newell agreed, and drove to the station. Shortly after 8:00 p.m., the detectives began questioning Newell. The entire interrogation was videotaped. Fewer than ten minutes into the interview, the detectives advised Newell of the *Miranda*[2] rights. Newell waived those rights and agreed to speak with the detectives.

¶14 The questioning began in a manner similar to the two previous interviews, but became more accusatory after the second hour. The detectives told Newell that they had evidence that proved he had committed the murder. Newell initially denied having anything to do with Elizabeth's death; however, that changed as the interrogation continued.

---

[2]    *See Miranda v. Arizona*, 384 U.S. 436 (1966).

**¶15**     Eventually, Newell acknowledged that he had been with Elizabeth in the field on the morning of her disappearance.  He admitted he had grabbed her and placed her between his legs while he rubbed up against her, causing him to ejaculate.  He then acknowledged placing her in the water in the ditch by grabbing her purse strap - which was around her neck - and her feet.  When he saw the SRP employee, he covered Elizabeth with the indoor-outdoor carpeting and ran off.  Throughout the interrogation he maintained that Elizabeth was alive when he placed her in the ditch and that he did not sexually abuse her.  Newell was taken to jail shortly before eleven in the morning on June 5, 2001.

**¶16**     Later that day, the SRP employee was shown another photo lineup, which included a picture of Newell; he identified Newell as the person he had seen in the ditch on May 23, 2001.

**¶17**     Over the next few days, a criminalist with the DPS crime lab conducted an analysis on Elizabeth's underwear.  During the analysis, semen was found inside of the central crotch area.  The criminalist then did a deoxyribonucleic acid ("DNA") analysis of sperm that were found.  The following week, a DNA analysis was conducted on a blood sample from Newell to see if it matched the DNA from the sperm found in Elizabeth's

underwear. Based on this analysis, it was determined that Newell was the likely source of the sperm.[3]

¶18 On June 14, 2001, a Maricopa County grand jury indicted Newell on three counts related to the disappearance and death of Elizabeth Byrd: first degree murder, sexual conduct with a minor, and kidnapping. Nearly three years later, after an eleven-day trial, a jury found Newell guilty of all three counts.

¶19 In the aggravation phase of the sentencing proceeding on the first degree murder charge, the jury found that the following aggravating circumstances had been proved beyond a reasonable doubt: a previous conviction for a serious offense, Ariz. Rev. Stat. ("A.R.S.") § 13-703(F)(2) (Supp. 2003); the murder was committed "in an especially heinous, cruel or depraved manner," § 13-703(F)(6); and at the time of the murder the defendant was an adult and the victim "was under fifteen years of age," § 13-703(F)(9). At the penalty phase of the sentencing proceedings, the jury heard testimony about Newell's

---

[3] Newell's DNA matched at all 14 loci. The statistical probability of a match for this sperm profile was "one in 860 trillion Caucasians, one in 15 quadrillion of African Americans, and one in 730 trillion Hispanics."

childhood, family life, and opportunities to get help for his substance abuse.[4]

¶20 The jury determined that Newell should be sentenced to death for the first degree murder conviction. For the sexual conduct with a minor and kidnapping convictions, the court sentenced Newell to consecutive aggravated terms of twenty-seven years and twenty-four years respectively. An automatic notice of appeal was filed with this Court under Rules 26.15 and 31.2(b) of the Arizona Rules of Criminal Procedure. We have jurisdiction under Article 6, Section 5(3), of the Arizona Constitution and A.R.S. § 13-4031 (2001).

**II**

¶21 Newell first claims that the trial court abused its discretion by failing to suppress the statements he made to the detectives during the June 4, 2001, interrogation.[5] He argues

---

[4] Defense Counsel refers to this phase as the "mitigation phase" of the trial. A capital trial is made up of a guilt proceeding or trial, *see* A.R.S. § 13-703(A), (D), and if necessary a sentencing proceeding consisting of an aggravation phase and a penalty phase, § 13-703(B), (C) and § 13-703.01 (Supp. 2003). For purposes of consistency and clarity, we will use, in this opinion and all future opinions, the language found in A.R.S. § 13-703 to refer to the stages of a capital trial. We urge counsel to conform to this convention as well when making submissions to this Court.

[5] Newell concedes that even without these statements, overwhelming evidence establishes his guilt. However, he argues that the admission of the statements affected the jury's determination to impose the death penalty. In particular, he argues that the jury would not have found that the murder was

- 9 -

that these statements should have been suppressed for two reasons. First, he asserts that the detectives violated his right to counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966). Second, he contends that the inculpatory statements were involuntarily made.

**A**

**¶22** When reviewing a trial court's determination on the admissibility of a defendant's statements, this Court must determine whether there has been clear and manifest error.[6] *State v. Jones*, 203 Ariz. 1, 5, ¶ 8, 49 P.3d 273, 277 (2002) (citing *State v. Eastlack*, 180 Ariz. 243, 251, 883 P.2d 999, 1007 (1994)). A trial court's ruling on a motion to suppress is reviewed solely based on the evidence presented at the suppression hearing. *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996) (citing *State v. Flower*, 161 Ariz. 283, 286 n.1, 778 P.2d 1179, 1182 n.1 (1989)).

---

especially heinous or depraved under the A.R.S. § 13-703(F)(6) aggravator if these statements had been excluded.

[6] This standard applies whether the Court is reviewing the admissibility based on a violation of defendant's right to counsel under *Miranda*, *see State v. Jones*, 203 Ariz. 1, 4-5, ¶¶ 7-8, 49 P.3d 273, 276-77 (2002), or determining whether the confession was voluntary, *see State v. Ross*, 180 Ariz. 598, 603, 886 P.2d 1354, 1359 (1994). We have equated this standard with the abuse of discretion standard. *Jones*, 203 Ariz. at 5, ¶ 8, 49 P.3d at 277.

- 10 -

¶23    Newell claims that his statements must be suppressed because the detectives did not honor his requests for the presence of counsel during questioning.

¶24    *Miranda* held that the Fifth Amendment's protection against self-incrimination, as applied to the states through the Fourteenth Amendment, requires procedural safeguards during a custodial interrogation.  384 U.S. at 444.  The prosecution may not use any statement made by the defendant, whether exculpatory or inculpatory, unless those procedural safeguards are provided. *Id.*  The right to the presence of an attorney is one of the rights of which a person subject to custodial interrogation must be informed under *Miranda*.  *Id.*  If the person being interrogated asserts the right to an attorney, all questioning must cease until an attorney is present or the defendant reinitiates communication.  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda*, 384 U.S. at 474.

¶25    Before an officer must cease questioning, however, the defendant must unambiguously request the presence of counsel. *Davis v. United States*, 512 U.S. 452, 459 (1994).  A person subject to custodial interrogation "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id.*  If a

reasonable officer in the circumstances would have understood only that the defendant *might* want an attorney, then questioning need not cease. *Id.* Although an officer is not required to do so, the Court in *Davis* recommended that a police officer suspend interrogation related to the crime when a suspect makes an ambiguous or equivocal statement relating to the presence of counsel and clarify whether the presence of an attorney indeed has been requested. *Id.* at 461.

¶26 Newell claims that during the interrogation he unequivocally invoked his right to counsel several times. The superior court disagreed and denied Newell's motion to suppress his statements because it found that Newell's alleged invocations of his right to counsel were, at best, equivocal.

¶27 We review the factual findings underlying this determination for abuse of discretion but review the court's legal conclusions de novo. *State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004).

¶28 Although Newell voluntarily went to the Sheriff's Office, the procedural protections of *Miranda* apply because Newell was subject to custodial interrogation.[7] Therefore, if

---

[7] The State concedes that Newell was subject to custodial interrogation, if not from the beginning of the June 4, 2001, interview, then at least after he was told by one of the detectives that he was not free to leave. *See Miranda*, 384 U.S. at 444 (stating that custodial interrogation is "questioning initiated by law enforcement officers after a person has

- 12 -

any of Newell's alleged requests for counsel were unambiguous, the superior court would have been required to suppress the statements. We conclude, however, that Newell did not make any unequivocal requests for counsel.

¶29        First, Newell claims that he unambiguously invoked his right to counsel three times during a one-minute colloquy in the interrogation's third hour. Newell argues that he first invoked his right to counsel when he said, "I want to call my lawyer." Without further context, this statement appears to be an unambiguous invocation of the right to counsel.

¶30        After reviewing the videotaped interrogation and hearing testimony from the detectives, the trial judge found that this statement was made while Newell and one of the detectives were talking over each other and it was reasonable to believe the statement could not be clearly heard. Given these circumstances, the judge found that the detective was free to follow up to determine what Newell had said, because the request was ambiguous. *See Davis*, 512 U.S. at 461.

¶31        During the detective's attempt to clarify Newell's initial request, Newell claims he made two further unequivocal

---

been . . . deprived of his freedom of action in any significant way").

requests for an attorney.[8]  The superior court found that both of the alleged requests were ambiguous because they occurred while Newell and the detective were talking over each other.  The court further found that one of the alleged requests was ambiguous because it was contradictory.  The court held that "in the total context of what is being exchanged, [Newell's requests for an attorney seem] to me not at all clear, and it's appropriate for the detective to ask for clarification."

¶32        We conclude that the superior court did not abuse its discretion in making this determination.  The entire exchange involving the three supposed requests for counsel occurred within one minute.  During this time, Newell and the detective were often speaking simultaneously.  As a result, Newell's requests were either not heard or heard in such a way that the detective reasonably found it necessary to ask for clarification.  *See id.*  Also, some of the alleged requests were contradictory; therefore, a reasonable officer would not consider them unequivocal.  *See id.* at 459.  The detective was

---

[8]    After the detective asked Newell whether he was requesting a lawyer, Newell first responded "No," and then said, "If I'm getting accused right now, if I'm getting charged for it yeah, I want my lawyer."  The detective then further attempted to clarify whether Newell wanted his attorney or whether he wanted to continue talking.  Newell responded by making a statement that sounded like "I'm willing" and something unintelligible before stating, "If I'm going to jail, I want to talk to my lawyer."

free to continue her questioning to "clarify whether or not [Newell] actually want[ed] an attorney." *Id.* at 461.

**¶33** The detective did precisely this. Newell, in response to a clarifying question, stated, "I want to talk to you. I have been down here talking to you guys every time you guys come after me." Once that response was received, further questioning was entirely appropriate.

**¶34** Newell next claims that approximately twenty minutes after the colloquy discussed above he again asked for an attorney by saying, "Can I have a lawyer?" This supposed request was not asserted by Newell at the suppression hearing. Newell's failure to assert this alleged invocation of the right to counsel normally would preclude appellate review of the claim. *See State v. Tison*, 129 Ariz. 526, 535, 633 P.2d 335, 344 (1981) (stating "[i]ssues concerning the suppression of evidence which were not raised in the trial court are waived on appeal") (citing *State v. Griffin*, 117 Ariz. 54, 570 P.2d 1067 (1977)). We may, however, review a suppression argument that is raised for the first time on appeal for fundamental error. *State v. Cañez*, 202 Ariz. 133, 151, ¶ 51, 42 P.3d 564, 582 (2002). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v.*

*Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)).

**¶35** We conclude no fundamental error occurred with respect to this alleged request. A review of the videotape does not reflect, as Newell claims, a clear invocation of the right to counsel. This alleged request for counsel was a barely audible, mumbled statement made while Newell and the detective were both talking. It was not a sufficiently clear invocation of the right to counsel under *Miranda*. *Davis*, 512 U.S. at 459.

**¶36** Newell finally argues that he unequivocally requested an attorney five hours into the interrogation by saying, "That's it. I want to talk to a lawyer right now." The superior court found that Newell's statement was unclear and it was reasonable to believe that the detective did not hear a clear request for an attorney.

**¶37** A review of the videotape supports the superior court's determination.[9] It is nearly impossible to understand Newell's statement. In fact, Newell's trial counsel abandoned this alleged invocation at the suppression hearing because he

---

[9]  The determinations of the trial court and this Court were profoundly aided by the fact that the interrogation was recorded in its entirety. It is specifically for this reason that we have, in the past, recommended the use of videotaping during "the *entire* interrogation process." *Jones*, 203 Ariz. at 7, ¶ 18, 49 P.3d at 279.

could not hear the request on the tape.  Our review of the videotape supports the same conclusion.  Therefore, the superior court did not abuse its discretion by finding that Newell had not clearly invoked his right to counsel as required by *Davis*.

C

¶38      Newell also argues that even if the statements were not obtained in violation of *Miranda*, they must be suppressed as involuntary.   He claims that his statements were rendered involuntary by the length of the interrogation, the inability to get counsel after multiple alleged requests, promises made by the detectives, inappropriate appeals to religious beliefs, and comments related to a woman for whom he cared deeply.

¶39      In determining whether a confession is involuntary, the "[court] must look to the totality of the circumstances surrounding the giving of the confession."  *State v. Montes*, 136 Ariz. 491, 496, 667 P.2d 191, 196 (1983).  Then the court must determine whether, given the totality of the circumstances, the defendant's will was overborne.  *State v. Tapia*, 159 Ariz. 284, 287-88, 767 P.2d 5, 8-9 (1988).  A confession is "prima facie involuntary and the state must show by a preponderance of the evidence that the confession was freely and voluntarily made." *Montes*, 136 Ariz. at 496, 667 P.2d at 196.

¶40      The superior court found, after hearing the testimony presented at the suppression hearing and reviewing the relevant

portions of the taped confession, that "considering the totality of the circumstances, defendant's will was not overcome and the statements were voluntary." "A trial court's finding of voluntariness will be sustained absent clear and manifest error." *State v. Poyson*, 198 Ariz. 70, 75, ¶ 10, 7 P.3d 79, 84 (2000).

¶41 Newell complains that his will was overborne by the length of the interrogation. The length of the interrogation alone, however, is insufficient to find a confession involuntary. *State v. Doody*, 187 Ariz. 363, 369, 930 P.2d 440, 446 (App. 1996) (stating that a thirteen hour interrogation, without significant breaks, does not prove, by itself, that the defendant's will to resist confessing was overcome). It is merely one factor to be taken into consideration. *See id.*

¶42 The interrogation here lasted about fourteen hours, but not all of that time involved questioning. The detectives gave Newell multiple breaks to smoke and use the restroom. He also spent time alone in the room writing letters and sleeping. The videotape of the interrogation supports the trial judge's finding that Newell's will was not overborne because of the length of questioning.

¶43 Newell also claims that his confession was involuntary because the detectives repeatedly ignored his unequivocal requests for counsel. As discussed above, we conclude that

Newell did not make an unequivocal request for counsel. Even if these requests had been unambiguous, however, they would not necessarily render the confession involuntary; such a circumstance would be one factor to consider in determining whether Newell's will had been overborne. *See, e.g.*, *People v. Bradford*, 929 P.2d 544, 566 (Cal. 1997). No evidence suggests that the detectives' refusal to honor Newell's ambiguous requests for counsel caused his will to be overborne. Newell continued to deny his involvement in Elizabeth's death for an extended time after his claimed requests for counsel.

¶44    Newell next complains that promises made by the detectives rendered his confession involuntary. We have held that a direct or implied promise, however slight, will render a confession involuntary when it was relied upon by the defendant in making a confession. *State v. Blakley*, 204 Ariz. 429, 436, ¶ 27, 65 P.3d 77, 84 (2003). The superior court, by denying the motion to suppress, implicitly found that there were no promises or, if there were promises, they were not relied upon. In either case, we conclude that there was no abuse of discretion.

¶45    The statements about which Newell complains relate to suggestions by the detective that he would feel better if he confessed.[10] Newell also alleges that the detectives' promise to

---

[10]    The detectives told Newell throughout the interrogation that the first step to getting help was to admit that he had

- 19 -

keep him safe while in jail rendered his confession involuntary.[11] We conclude, given the context, that neither of those comments rose to the level of a promise that prompted Newell to confess.

¶46     Even if they were promises, however, Newell did not rely upon them when he made his inculpatory statements. Almost immediately after hearing the alleged promises, Newell again denied ever having been in the field with Elizabeth. These denials continued throughout most of the interrogation. Therefore, the alleged promises did not render the confession involuntary.

¶47     Newell also claims that one of the detectives made references to religion, which added to the coercive nature of the interrogation and, in addition to everything else, caused his will to be overborne. The statements about which Newell complains related to "get[ting] right with God," confessing sins, and asking for forgiveness.

¶48     Appeals to religion do not render confessions involuntary unless they lead to the suspect's will being overborne. *See, e.g.*, *United States v. Miller*, 984 F.2d 1028,

_____

done something wrong. They also told Newell that confessing would lift a heavy burden off of his shoulders.

[11]    After Newell had expressed concern for his safety in jail, the detectives merely assured Newell that he would be kept safe.

1031-32 (9th Cir. 1993); *Welch v. Butler*, 835 F.2d 92, 95 (5th Cir. 1988); *Noble v. State*, 892 S.W.2d 477, 483 (Ark. 1995), *overruled on other grounds by Grillot v. State*, 107 S.W.3d 136 (Ark. 2003); *Le v. State*, 913 So. 2d 913, 933-34, ¶¶ 60-64 (Miss. 2005). No evidence indicates that any religious references caused Newell's will to be overborne.

¶**49** Newell's final complaint concerns statements relating to someone for whom Newell cared. One of the detectives asked Newell whether he would want the woman he cared for to be told that he had been completely honest or that he was a sociopath who was hiding things. He claims that these statements were threats to get him to confess. Taken in context, however, none of these statements rise to the level of a threat, nor did any cause Newell to make incriminatory statements. Newell asked the detectives to talk to this woman because he felt that "she need[ed] to know" what was going on, and at one point he said that it did not matter what the detective told this woman because she was probably not going to be around anyway. We therefore conclude that these alleged threats did not render Newell's statements involuntary.

¶**50** In sum, the superior court did not abuse its discretion when it found, based on the totality of the circumstances, that Newell's will was not overborne. Even considering, in the aggregate, all of the conduct about which

Newell complains, at no time during the interview did Newell capitulate and say what he thought the detectives wanted to hear. In fact, despite making several incriminating statements, he persistently refused to admit to sexually assaulting Elizabeth or to tying the purse strap around her neck. Accordingly, the totality of the circumstances supports the superior court's conclusion that Newell's statements were voluntarily made. Thus, Newell's argument that the death sentence must be reversed fails on these grounds.

**III**

¶51 Newell next challenges the State's peremptory strike of prospective juror 34, the only remaining African-American on the venire panel,[12] under *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* held that using a peremptory strike to exclude a potential juror solely on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 89. Newell claims that the superior court's denial of his *Batson* challenge was clearly erroneous and, as a result, reversible error.

¶52 A denial of a *Batson* challenge will not be reversed unless clearly erroneous. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *State v. Cruz*, 175 Ariz. 395, 398, 857 P.2d 1249,

---

[12] The only other African-American on the jury panel who had completed the questionnaire was excused for hardship reasons.

1252 (1993).  "We review de novo the trial court's application of the law."  *State v. Lucas*, 199 Ariz. 366, 368, ¶ 6, 18 P.3d 160, 162 (App. 2001).

¶**53**      A *Batson* challenge involves a three-step analysis. First, the defendant must make a prima facie showing that the strike was racially discriminatory.  If such a showing is made, the burden then switches to the prosecutor to give a race-neutral explanation for the strike.  Finally, if the prosecution offers a facially neutral basis for the strike, the trial court must determine whether "the defendant has established purposeful discrimination."   *Batson*, 476 U.S. at 93-94, 97-98; *see also Cañez*, 202 Ariz. at 146, ¶ 22, 42 P.3d at 577.

¶**54**      The first step of the *Batson* analysis is complete when the trial court requests an explanation for the peremptory strike.  *State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997).   Here, the trial court made that request of the prosecutor; therefore, the burden shifted to the prosecutor to give a race-neutral basis for the peremptory strike.  *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *Batson*, 476 U.S. at 97-98. "Unless a discriminatory intent is inherent in the prosecutor=s explanation," this burden is satisfied by a facially valid explanation for the peremptory strike.  *Hernandez v. New York,* 500 U.S. 352, 360 (1991) (plurality opinion).  To pass step two, the explanation need not be "persuasive, or even plausible."

*Purkett*, 514 U.S. at 767-68. "It is not until the *third* step that the persuasiveness of the justification becomes relevant . . . ." *Id.* at 768. In determining whether the defendant has proven purposeful discrimination, "implausible or fantastic justifications may (and probably will) be found to be pretext[ual]." *Id.; see also Miller-El*, 537 U.S. at 338-39. This third step is fact intensive and will turn on issues of credibility, which the trial court is in a better position to assess than is this Court. *See Miller-El*, 537 U.S. at 339-40. Therefore, the trial court's finding at this step is due much deference. *Id*. at 340.

¶55     When asked for an explanation of the peremptory strike, the State stated that it struck the juror because of her answers relating to the imposition of the death penalty, both in her questionnaire and in individual voir dire. On the questionnaire, she stated that she would not be able to vote for the death penalty. Also, during individual voir dire, she told the prosecutor that she would "more than likely not" be able to vote for the death penalty. In response to questions asked by defense counsel, however, the juror answered that she could consider voting for the death penalty if the court instructed that it needed to be considered. The prosecution then asked the juror follow-up questions. In her answers to those questions, she confirmed that her views on the death penalty would not

substantially impair her ability to follow the court's instructions and that she could vote for the death penalty.

¶56     The trial judge then questioned the juror. When asked whether she would give a life sentence rather than impose the death penalty if the defendant did not present any evidence of mitigation, she responded in the affirmative. Because this answer contradicted her statements to defense counsel - that she could impose the death penalty - the judge said, "I'm confused then under what circumstances you would impose the death penalty." The juror answered, "I'm not sure, actually. Depends on what's presented." After further explanation of the legal standard related to mitigation, the juror acknowledged that she had not understood the court's question and that she could "[a]bsolutely" impose the death penalty when the defendant did not introduce any mitigating evidence.

¶57     After this exchange, the prosecutor stated that he did not believe he had "grounds to strike her for cause." But he subsequently used one of his peremptory strikes to strike the juror from the list of potential jurors.

¶58     The prosecutor's reason for striking the juror, which involved the juror's contradictory responses about whether she could vote to impose the death penalty, satisfied step two of *Batson* because it was facially race-neutral. *See Miller-El v. Dretke*, ___ U.S. ___, ___, 125 S. Ct. 2317, 2329-30 (2005)

(discussing the fact that inconsistent responses may be a reasonable race-neutral explanation for a peremptory strike, unless it is undercut by other evidence); *Puckett v. State*, 788 So. 2d 752, 761 (Miss. 2001). Moreover, Newell offered no evidence, other than inference, to show that the peremptory strike was a result of purposeful racial discrimination. *See Purkett*, 514 U.S. at 768 (holding that the "opponent of the strike" carries the ultimate burden of persuasion in a *Batson* challenge). We find no error in the superior court's determination that the State's peremptory strike did not violate *Batson*.

## IV

¶59     Newell contends that the trial court abused its discretion when it denied his motion for a mistrial. Newell argues that statements made by the prosecutor during closing arguments constituted prosecutorial misconduct and warranted a mistrial because they improperly vouched for the State's evidence and impugned the integrity of defense counsel.

## A

¶60     To determine if a prosecutor's comments constituted misconduct that warrants a mistrial, a trial court should consider two factors:  (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that

the jurors were in fact influenced by the remarks. *State v. Atwood,* 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992) (quoting *State v. Hansen*, 156 Ariz. 291, 296-97, 751 P.2d 951, 956-57 (1988)), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001). The defendant must show that the offending statements, in the context of the entire proceeding, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (internal quotation omitted).

¶61     Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury, we will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion. *State v. Lee*, 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997) (citing *State v. White*, 160 Ariz. 24, 33-34, 770 P.2d 328, 337-38 (1989)); *Hansen*, 156 Ariz. at 297, 751 P.2d at 957 (citing *State v. Robles*, 135 Ariz. 92, 94, 659 P.2d 645, 647 (1983)). To warrant reversal, the prosecutorial misconduct must be "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Lee*, 189 Ariz. at 616, 944 P.2d at 1230 (quoting *Atwood*, 171 Ariz. at 611, 832 P.2d at 628).

**B**

- 27 -

¶62    Newell first claims that the prosecutor improperly vouched for the strength of the State's case when he commented, in rebuttal closing argument, that there were "3,000 pages of police reports" and that "[n]ot every witness was called." Prosecutorial vouching takes two forms:    "(1) where the prosecutor places the prestige of the government behind its [evidence] [and] (2) where the prosecutor suggests that information not presented to the jury supports the [evidence]." *State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). Newell argues that these statements fall into the second category.  We disagree.

¶63    The prosecutor's statements were not meant to bolster the State's case.  Rather, they were an attempt to explain to the jury, in response to statements made in Newell's closing argument, why certain witnesses had not been called to testify. The prosecutor's response merely explained to the jury that there were simply too many documents and witnesses for either side to be able to present them all.  The prosecutor did not imply that these police reports and witnesses supported the State's case.  Therefore, the trial court did not abuse its discretion by denying the motion for a mistrial on this basis.

¶64    The second ground for Newell's prosecutorial misconduct claim relates to the prosecutor's statements, also made during rebuttal closing argument, about the superiority of

DNA evidence.   First, the prosecutor said, "[N]o matter what defense counsel tells you, we all know that DNA is . . . the most powerful investigative tool in law enforcement at this time."   He then went further, after defense counsel's objection to the first statement was overruled, by telling the jury that defense counsel knew this was true.   The court sustained Newell's objection to this latter statement.   Newell argues that these statements required a mistrial because they improperly vouched for the State's evidence and impugned the integrity of defense counsel.

¶65      We agree that both comments were improper.   The prosecutor's statement about the superiority of DNA evidence improperly vouched for the State's evidence.   No opinions had been elicited about the preeminence of DNA evidence.   The prosecutor's comment here - that everyone knows that DNA evidence is the best investigative tool around – did improperly vouch for the strength of the State's evidence against Newell. *Cf. Vincent*, 159 Ariz. at 423, 768 P.2d at 155 (prosecutor improperly vouches by suggesting that evidence not presented to the jury supports the presented evidence).

¶66      The prosecutor also improperly commented about what defense counsel knew about the strength of DNA evidence.   We have previously stated that it is improper to impugn the integrity or honesty of opposing counsel. *See Hughes*, 193 Ariz.

at 86, ¶ 59, 969 P.2d at 1198.  The prosecutor, by stating that defense counsel knew that DNA evidence is a compelling investigative tool, was insinuating, if not directly stating, that any argument made to the contrary was disingenuous. Because defense counsel, in his closing argument, had questioned whether the DNA evidence proved anything beyond a reasonable doubt, the prosecutor's response in claiming that defense counsel knew that DNA was superior evidence called into question the integrity of defense counsel.

¶67     Such improper comments by the prosecutor will not require reversal of a defendant's conviction, however, unless it is shown that there is a "reasonable likelihood" that the "misconduct could have affected the jury's verdict."  *Atwood*, 171 Ariz. at 606, 832 P.2d at 623.  Also, any improper comments must be so serious that they affected the defendant's right to a fair trial.  *State v. Dumaine*, 162 Ariz. 392, 403, 783 P.2d 1184, 1195 (1989).  Although we find the comments of the prosecutor improper, for several reasons we conclude that the defendant was not convicted on the basis of those comments and they did not deny him a fair trial.

¶68     First, as a part of the standard jury instructions, the superior court instructed the jury that anything said in closing arguments was not evidence.  We presume that the jurors

followed the court's instructions. *See State v. Ramirez*, 178 Ariz. 116, 127, 871 P.2d 237, 248 (1994).

¶69 Moreover, defense counsel's objection to the statement impugning his honesty was sustained. We have said, "when counsel's personal beliefs are unfairly attacked, '[t]he proper remedy for such a serious error . . . is objection, motion to strike, and an instruction . . . that the jury should disregard the improper comment.'" *Vincent*, 159 Ariz. at 424, 768 P.2d at 156 (alterations in original) (quoting *State v. Woods*, 141 Ariz. 446, 455, 681 P.2d 1201, 1210 (1984)). Although no jury instruction immediately followed the sustained objection, the court did instruct the jury at the end of the trial that any sustained objection meant that the information must be disregarded. Again, because we presume jurors follow the court's instructions, *see Ramirez*, 178 Ariz. at 127, 871 P.2d at 248, we conclude that this comment also did not affect the jury verdict.

¶70 Finally, the trial court determined that the statements about which Newell complains were not so prejudicial that they required a mistrial. When considered in the context of the entire trial, we agree that the overwhelming evidence of guilt influenced the jury to convict Newell rather than the prosecutor's statements about the DNA evidence and defense counsel. Moreover, as noted above, *see supra* note 5, Newell

concedes the evidence overwhelmingly establishes his guilt. Therefore, despite the fact that these comments were improper, they were not so prejudicial as to deprive Newell of his right to a fair trial.

V

**¶71**     Next, Newell claims that the trial court's failure to preclude the rebuttal testimony of his adult probation officer at the penalty phase of the sentencing proceeding was an abuse of discretion.   The testimony about which Newell complains referred to the opportunities Newell was offered to get help for his drug problem.   Newell contends that he did not present evidence of his inability to get help for his drug problem as a mitigating factor; consequently, the State was not entitled to present evidence in rebuttal that Newell had had opportunities to get help.

**¶72**     The trial court determined that the probation officer's testimony was admissible to rebut Newell's statements made during the course of the interrogation about needing and being unable to get help for his drug problem.   The trial judge believed that because the jurors had heard these statements during the guilt phase, they could possibly rely on them when deciding whether Newell deserved leniency.   Therefore, the court concluded that this was "appropriate grist for the rebuttal mill."

¶73     We review a trial court's ruling on the admissibility of evidence for abuse of discretion.  *State v. Aguilar*, 209 Ariz. 40, 49, ¶ 29, 97 P.3d 865, 874 (2004).  We will review "purely legal issues de novo."  *Moody*, 208 Ariz. at 445, ¶ 62, 94 P.3d at 1140.

¶74     Newell's objection to the testimony of the probation officer implicates two subsections of A.R.S. § 13-703.  Subsection (G) permits a jury to consider any factors that are offered - no matter who offers them - when considering mitigation.  § 13-703(G).  Subsection (D) provides that any evidence admitted during the guilt phase of the trial is admitted for purposes of the sentencing proceeding.  § 13-703(D).

¶75     Newell claims that the State's presentation of evidence to rebut statements he made during his interrogation amounted to "an end-run around" his choice not to present evidence of his alleged inability to obtain treatment for his drug addiction.  We disagree with this contention for two reasons.  First, Newell himself put forth evidence during the guilt and penalty phases of the trial related to his drug use and his desire for help to overcome it.  In the guilt phase, on cross-examination of one of the detectives, Newell elicited evidence of his struggle with drug addiction and his attempts to get help.  In the penalty phase, witnesses testified about

Newell's exposure to drugs at an early age, including the fact that his stepfather used drugs with Newell when he was only in seventh grade. Newell also mentioned his long history of substance abuse in his allocution. Second, during his interrogation, Newell referred numerous times to his inability to obtain help for his drug problem. For instance, he spoke about wanting to live without drugs and about asking for help when he got out of jail; he stated that no one helped him when he asked for help; and he told the detectives that people with problems like his should receive help.

¶76    The evidence presented during the guilt phase of the trial was deemed admitted for purposes of the sentencing proceeding because the same jury that determined Newell's guilt also decided whether he should receive the death penalty. A.R.S. § 13-703(D). Therefore, although Newell did not expressly offer as a mitigating factor his alleged inability to get treatment for his drug addiction, the jury still could have factored his complaints on this topic, along with the other evidence presented during the penalty phase about Newell's drug use, into its consideration of whether the mitigating circumstances were "sufficiently substantial to call for leniency." A.R.S. § 13-703(E), (G).

¶77     Thus, the trial court's determination that the State could present testimony from Newell's probation officer in rebuttal was not an abuse of discretion.

**VI**

¶78     Finally, Newell contends that the trial court abused its discretion by precluding the testimony of his mental health expert at the penalty phase as a sanction for refusing to undergo a court-ordered examination by the State's mental health expert.    Newell also argues that requiring him to submit to a mental health examination by the State's expert violates his privilege against self-incrimination.

¶79     Newell acknowledges that we have previously held that once a defendant puts his mental heath in issue, "during the penalty phase of a capital trial," a trial court may order the defendant to submit to a mental examination by the State's expert.  *Phillips v. Araneta*, 208 Ariz. 280, 283, ¶ 9, 93 P.3d 480, 483 (2004).  As long as the order assures the defendant specific protections, we held that this may be done without running afoul of the defendant's privilege against self-incrimination.  *Id.* at 284, ¶ 14, 93 P.3d at 484.  We further held that if the defendant refuses to submit to a court-ordered examination, the trial court may, as a sanction, preclude a defendant's mental-health related mitigation evidence at the penalty phase.  *Id.* at 285, ¶ 16, 93 P.3d at 485.

¶80        Newell presents no arguments that would compel us to revisit our decision in *Phillips*.  Therefore, the superior court did not err when it precluded the testimony of Newell's mental health expert.

**VII**

¶81        Because Elizabeth's murder occurred before August 1, 2002, we must independently review the jury's findings on "aggravation and mitigation and the propriety of the death sentence."  A.R.S. § 13-703.04 (Supp. 2003)*; see also* 2002 Ariz. Sess. Laws, 5th Spec. Sess., Ch. 1, § 7(B) (eff. Aug. 1, 2002). In our review, if we "determine[] that an error was made regarding a finding of aggravation . . ., [we] shall independently determine if the mitigation . . . is sufficiently substantial to warrant leniency in light of the existing aggravation."  A.R.S. § 13-703.04(B).  If we "find[] that the mitigation is sufficiently substantial to warrant leniency," then we must impose a life sentence.  *Id*.  Otherwise, we are required to affirm the death sentence.  *Id*.

¶82        In conducting our independent review we do not merely consider the quantity of aggravating and mitigating factors which were proven, but we look to the quality and strength of those factors.  *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998) (citing *State v. McKinney*, 185 Ariz. 567, 578, 917 P.2d 1214, 1225 (1996)).  We do not require that a

nexus between the mitigating factors and the crime be established before we consider the mitigation evidence. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004). But the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence. *See State v. Anderson*, 210 Ariz. 327, 350, ¶¶ 96-97, 111 P.3d 369, 392 (2005). Finally, "[w]e do not defer to the findings or decision of the jury," with respect to aggravation or mitigation, when "determin[ing] the propriety of the death sentence." *State v. Roseberry*, 210 Ariz. 360, 374, ¶ 77, 111 P.3d 402, 416 (2005).

¶83    Undisputed evidence supports the (F)(2) and (F)(9) aggravating circumstances. Newell's prior conviction for attempted kidnapping established that he had a serious prior felony conviction.[13]  A.R.S. § 13-703(F)(2). Moreover, Newell was an adult at the time of the murder and Elizabeth was eight years old. A.R.S. § 13-703(F)(9).

¶84    An aggravating circumstance is also established when murder is committed in an especially cruel, heinous or depraved

---

[13]    Under A.R.S. § 13-703(H)(10), kidnapping is a "serious offense." The (F)(2) aggravator is established by proof beyond a reasonable doubt of a prior conviction for a serious offense, "whether *preparatory* or completed." A.R.S. § 13-703(F)(2) (emphasis added). Therefore, because attempt is considered a preparatory offense, A.R.S. § 13-1001 (2001), a conviction for attempted kidnapping establishes the (F)(2) aggravator.

manner. A.R.S. § 13-703(F)(6). The cruelty prong of the (F)(6) aggravator focuses on the suffering of the victim, while the heinousness and depravity prongs focus on the state of mind of the defendant. *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980). A determination that the (F)(6) aggravator has been proven can be based on any or all of these prongs, because they are in the disjunctive. *See State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983) (quoting *Clark*, 126 Ariz. at 436, 616 P.2d at 896); *see also Anderson*, 210 Ariz. at 355-56, ¶ 128, 111 P.3d at 397-98.[14]

¶85      Here, substantial evidence supports the cruelty prong of the (F)(6) aggravator. Cruelty requires proof that the victim "consciously experienced physical or mental pain prior to death and the defendant knew or should have known that suffering would occur." *Trostle,* 191 Ariz. at 18, 951 P.2d at 883 (citation omitted). The evidence – bruising that occurred at or

---

[14]   We note that the jury verdict form in this case did not require the jury to specify upon which prong, or prongs, its determination with respect to the (F)(6) factor rested. "It is therefore possible the jury was not unanimous as to which prong satisfied the (F)(6) aggravator." *Anderson*, 210 Ariz. at 355, ¶ 126, 111 P.3d at 397. However, Newell, unlike the defendant in *Anderson*, did not raise a claim that he was denied a unanimous verdict on the (F)(6) aggravator. We therefore do not consider that issue. For purposes of our independent review, however, Newell's failure to raise any further grounds upon which the jury's finding with respect to this aggravator can be overturned does not affect our ultimate conclusion. Even if we were to ignore the (F)(6) aggravator, the strength and quality of the (F)(2) and (F)(9) aggravating circumstances alone would support the imposition of the death penalty.

near the time of death consistent with grasping of Elizabeth's arms, sexual assault-related bruises and injuries, testimony that it normally takes two minutes for death by asphyxiation to occur, and marks showing that Elizabeth was grasping at the ligature - all support the conclusion that this murder was especially cruel. Elizabeth suffered serious physical and mental anguish before she died. Newell should have known that such suffering would occur. Because we find that compelling evidence supports a finding of cruelty, we need not examine whether the evidence also establishes the heinousness or depravity prongs of (F)(6). *State v. Djerf*, 191 Ariz. 583, 595, ¶ 44, 959 P.2d 1274, 1286 (1998) (noting that "a finding of either cruelty or heinousness/depravity will suffice to establish" the (F)(6) factor).

¶86    The bulk of Newell's mitigation evidence related to his unstable childhood and drug use. Newell's witnesses testified that during childhood his home life was unstable. In addition, as a child he was exposed to people with drug addictions who engaged in drug-related activities. Several witnesses testified that Newell had been sexually and physically abused during his childhood. Finally, by all accounts, Newell had an extended history of drug use.

¶87    We conclude that Newell's mitigation evidence is not sufficiently substantial to call for leniency. No evidence

explains how Newell's drug addiction and unstable childhood led to the sexual assault and murder of eight-year-old Elizabeth. *See Anderson*, 210 Ariz. at 357, ¶¶ 135-37, 111 P.3d at 399. Moreover, in view of the compelling aggravating circumstances, the mitigation evidence simply fails to rise to a level that would call for leniency.

**VIII**

¶88      For the above reasons, we affirm Newell's convictions and sentences.

_____
Michael D. Ryan, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice