NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

BENNY CHARLES BROOKS, III, *Appellant.*

No. 1 CA-CR 23-0298
FILED 12-24-2024

Appeal from the Superior Court in Maricopa County
No.  CR2018-131721-001
The Honorable Mark Brain, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Rebecca Jones
*Counsel for Appellee*

Law Offices of Stephen L. Duncan, PLC, Scottsdale
By Stephen L. Duncan
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Acting Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Paul J. McMurdie and Chief Judge David B. Gass joined.

---

**C A T T A N I**, Acting Presiding Judge:

¶1        Benny Charles Brooks III appeals his convictions of 16 dangerous offenses arising from a home invasion in which two individuals were killed.  For reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        Michael, Paul, and Randall shared a house in Laveen.[1] Michael sometimes sold drugs out of the house.

¶3        Late one night in June 2018, three masked and black-clad armed men—Brooks, his uncle, and an unidentified third man—broke into the house.  The three zip-tied Michael, Randall, and three other people who were there at the time, then ransacked the house.  Gunfire erupted when they broke into Paul's room, leaving Brooks wounded and Michael and Brooks's uncle dead.  Brooks and the third man fled the house, and Brooks was arrested at a hospital hours later.

¶4        The State charged Brooks with two counts of first-degree murder, one count of first-degree burglary, two counts of armed robbery, two counts of aggravated robbery, five counts of aggravated assault, and six counts of kidnapping.[2]  At trial, the State theorized that Brooks had coordinated with another person named Jacob—who knew both Brooks and Michael and had purchased cocaine from Michael just hours before the home invasion—to commit the home invasion to steal drugs.  Brooks, in contrast, argued that Paul and Randall were involved in dealing drugs and had staged the home invasion after a drug deal went wrong.

¶5        The jury acquitted Brooks of one count each of armed robbery and aggravated robbery but found him guilty of the 16 other offenses as

---

[1]        We use pseudonyms to protect the victims' privacy.
[2]        The State also charged Brooks with one count of unlawful use of means of transportation, but the court granted the parties' request to dismiss that count during trial.

charged. The superior court sentenced Brooks to ten concurrent 15- and 20-year terms of imprisonment, followed by four more concurrent 15- and 20-year terms to be served concurrently with sentences of natural life and life in prison for the murder convictions.

¶6          Brooks timely appealed. We have jurisdiction under A.R.S. § 13-4033(A)(1).

## DISCUSSION

### I.    Due Process.

¶7          Brooks argues the trial was infected by two due process violations that warrant reversal: (1) alleged error in the way courtroom security performed its role, and (2) alleged unfair prejudice when the superior court informed the jury that Brooks had been held in custody for over a year after his arrest at the hospital.

#### A.    Courtroom Security.

¶8          Brooks argues the superior court allowed detention deputies to create a prejudicial atmosphere in the courtroom, asserting that the way the deputies were positioned suggested to jurors that Brooks was a violent person who required close supervision to ensure safety in the courtroom.

¶9          The Fourteenth Amendment secures criminal defendants' right to a fair trial, including a presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). To protect this right, courts guard against practices, including security measures and even a defendant's attire, that may improperly affect jurors' judgment and thereby undermine the fairness of trial. *Id.* at 503–05. We review the superior court's decision on courtroom security measures for an abuse of discretion, *State v. Cruz*, 218 Ariz. 149, 168, ¶ 118 (2008), and will uphold such a decision if supported by the record, *State v. Davolt*, 207 Ariz. 191, 211, ¶ 84 (2004). Where the record on appeal is incomplete, we presume the missing portions support the court's actions. *State v. Printz*, 125 Ariz. 300, 304 (1980).

¶10         On several occasions during trial, Brooks expressed concerns about what he characterized as a "coercive" security presence.[3] On the first day of trial, Brooks asserted that a detention officer was creating a coercive

---

[3]          The court addressed security and courtroom etiquette on several other occasions during trial, but Brooks does not raise these incidents on appeal.

atmosphere by standing in such a way as to indicate Brooks was in custody. The detention officer stepped away when requested, but Brooks took issue with the positioning of the officer's chair. The superior court noted that it found nothing coercive about the officer's actions and offered to tell the jurors that "deputies are just around to take care of anything I need and they are assigned to courtrooms as a matter of course." Brooks did not respond to the court's offer.

¶11 On the third day of trial, Brooks again objected to courtroom security as "coercive in a sense that it's suggesting . . . a problem between individuals here" that would make the jury believe this type of security is required. The superior court again found nothing coercive about the officers' behavior, noting they had been acting professionally. Aside from part of the transcript reflecting that there were four officers in the courtroom that day, no further record was made on the issue.

¶12 Relying on *Deck v. Missouri*, 544 U.S. 622 (2005), and *State v. Eddington*, 226 Ariz. 72 (App. 2010), Brooks asserts that the detention officers' presence created an atmosphere that suggested Brooks was a violent person who needed to be watched closely, effectively undermining his presumption of innocence. But as Brooks recognizes, *Deck* involved the "inherently prejudicial" nature of forcing a defendant to wear visible shackles. 544 U.S. at 626–29 (citation omitted). Similarly, *Eddington*'s reasoning was based on case law regarding the risk of prejudice stemming from forcing a defendant to appear in jail attire. 226 Ariz. at 78, ¶ 16 (citing *Estelle*, 425 U.S. at 504–05). Neither shackles nor jail attire are at issue here, and the mere fact of enhanced courtroom security does not establish that Brooks was denied a fair trial. *See Holbrook v. Flynn*, 475 U.S. 560, 568–59 (1986). The superior court noted Brooks's concerns but reasonably found that the officers' presence was not inherently prejudicial, and even offered to inform the jurors of a neutral reason for the officers' presence. Nothing in the record calls into question this finding or otherwise suggests that the presence of courtroom security was so extreme as to render the trial "inherently lacking in due process." *Id.* at 570–72; *Estes v. Texas*, 381 U.S. 532, 542–43 (1965). Accordingly, Brooks has not established that the superior court abused its discretion in managing courtroom security.

### B. Custodial Status.

¶13 Brooks also argues his right to a fair trial was violated when the superior court informed the jury that he remained in custody for over a year after his arrest at the hospital, which he asserts undermined his presumption of innocence. We review evidentiary decisions for an abuse

of discretion but consider constitutional questions de novo. *State v. Smith*, 215 Ariz. 221, 228, ¶ 20 (2007).

¶14 The issue of Brooks's prior custodial status arose in the context of DNA results from a handgun used in the home invasion. Police recovered the gun in July 2019 (over a year after the offenses), during an unrelated investigation. At Brooks's trial, the State's DNA expert testified that he could neither include nor exclude Brooks as a contributor to the DNA found on the handgun.

¶15 Brooks sought to call his own expert to testify that his DNA was in fact *not* found on the handgun. The superior court advised Brooks that such testimony would be affirmatively misleading given that Brooks could not have touched the gun after the home invasion because he had been held in custody the entire period from his arrest (just hours after the offenses) to when the gun was recovered. The court thus advised Brooks that his custodial status over that period would become relevant and admissible if his expert were to testify that Brooks's DNA was not on the handgun.

¶16 Brooks nevertheless called the expert, who testified that Brooks's DNA was not on the handgun. On cross-examination, however, Brooks's expert accepted the prosecutor's statement that Brooks did not have contact with the handgun during the 13-month period before the gun was recovered. Over Brooks's objection, the superior court then told the jury that it took judicial notice of the fact that Brooks could not have had contact with the handgun for those 13 months because he "was taken into custody at the hospital and remained in custody at the time the handgun was located." The court instructed the jurors to consider this fact only in evaluating the evidence of DNA on the handgun and not for any other purpose.

¶17 Brooks again relies on *Deck*, 544 U.S. 622, and *Eddington*, 226 Ariz. 72, to suggest that informing the jury of his prior incarceration eroded his presumption of innocence. But again, those cases addressed practices (visible shackles and jail attire) that provided pervasive reminders of a defendant's current custodial status. *See supra* ¶ 12. Introducing evidence showing a defendant has been in custody at some point—such as evidence of jail calls, interview videos, or other similar material—does not implicate the same concerns because such evidence is not a "constant reminder of the accused's condition" during the trial that "furthers no essential state policy." *Estelle*, 425 U.S. at 504–05; *see also State v. Murray*, 184 Ariz. 9, 35 (1995) ("Certainly the jurors were aware that defendants were arrested and

had spent some time in custody prior to trial. Such knowledge is not prejudicial and does not deny defendants the presumption of innocence."); *State v. Byrd*, 109 Ariz. 387, 389 (1973) (noting that when the fact of a defendant's arrest is necessary to provide a complete story of the crime itself, such testimony is relevant and not unduly prejudicial).

**¶18** Moreover, even assuming it was unnecessary to inform the jury that Brooks was still in custody when the handgun was recovered, the jury had already heard Brooks was arrested at the hospital and charged with serious crimes. It would not have been a surprise to the jurors that Brooks had been taken into custody for at least some period, and in any event, the court instructed the jurors that they could consider the fact of Brooks's incarceration only as to the DNA evidence and for no other purpose. *See State v. Herrera*, 174 Ariz. 387, 395 (1993) (jury presumed to follow limiting instruction). Accordingly, Brooks has not shown reversible error on this basis.

## II.    Impeachment Evidence.

**¶19** Brooks next argues the superior court erred by denying his request to impeach Paul with a music video discovered after Paul testified. We review the superior court's ruling on the scope of cross-examination and the admissibility of impeachment evidence for an abuse of discretion. *See State v. Ellison*, 213 Ariz. 116, 132, ¶ 52 (2006).

**¶20** Here, Paul testified that he did not know about the guns or salable drugs in the house and that he had never entered the spare bedroom where Michael stored drugs. Brooks thereafter discovered a music video Paul had filmed earlier in 2018. Over the State's objection, Brooks sought leave to impeach Paul with the content of the music video, which Brooks argued showed Paul in the spare bedroom and with guns and drugs. Brooks further asserted that the video depicted Paul handling marijuana and with "an AR-15 rifle that may have been used in this shooting incident."

**¶21** After viewing the music video—which is not part of the record on appeal—the superior court precluded it as irrelevant and overly prejudicial. The court noted that no casings or bullets from an AR-15 were found following the home invasion, and the court further explained that the "music video, and a bunch of kids making a gangster-like video to look cool is not pertinent to the case to the extent it had anything to do with it. The prejudice greatly overwhelms all of it." When Brooks asserted that Paul should not be protected because he "admits to being involved in the

shooting, and we want to place a gun in his hand," the court clarified, "You are not placing a gun in his hand that day. You're placing a gun in his hand in some screwy Internet video."

**¶22** The court did not abuse its discretion. A court may permit impeachment by specific instances of conduct on cross-examination, but only if those instances "are probative of the [witness's] character for truthfulness or untruthfulness," Ariz. R. Evid. 608(b)(1), and their probative value is not substantially outweighed by the danger of unfair prejudice or confusion, *Murray*, 184 Ariz. at 30; *see also* Ariz. R. Evid. 403. Here, the music video was not meaningfully probative of Paul's credibility or on any other fact in issue. *See* Ariz. R. Evid. 401 (defining relevant evidence as that which "has any tendency to make a fact more or less probable" or "is of consequence in determining the action"). There was no dispute that Paul had been in the house previously—he lived there. And the fact that Paul made a video holding a gun not used in the home invasion did not make it more likely that he knew of a different gun or drugs in the house. The court thus did not abuse its discretion by finding the video to be largely irrelevant to Paul's credibility and collateral to any other issues.

## III. Prosecutorial Error.

**¶23** Finally, Brooks raises several instances of what he characterizes as prosecutorial misconduct[4] that he argues deprived him of a fair trial. Prosecutorial error warrants reversal only if (1) error occurred and (2) there is a reasonable likelihood the error could have affected the jury's verdict and denied the defendant a fair trial. *State v. Moody*, 208 Ariz. 424, 459, ¶ 145 (2004). Such error must be "so pronounced and persistent that it permeates the entire atmosphere of the trial," rendering the conviction a denial of due process. *State v. Morris*, 215 Ariz. 324, 335, ¶ 46 (2007) (quotation omitted).

### A. Use of Terms "Robber" and "Robbery."

**¶24** Brooks asserts that the State's use of the words "robber" and "robbery" in its opening statement and while questioning witnesses assumed his guilt and thus resulted in unfair prejudice. But simply using

---

[4] Although Brooks uses the term "prosecutorial misconduct," the conduct alleged is more properly characterized as "prosecutorial error." *See In re Martinez*, 248 Ariz. 458, 470, ¶ 47 (2020) (differentiating "between 'error,' which may not necessarily imply a concurrent ethical rules violation, and 'misconduct,' which may suggest an ethical violation").

the term "robbery" does not equate to a presumption of guilt. Instead, use of the term during opening statements reflected the prosecutor's theory of the case, informing the jury of what the State expected the evidence to show. *See State v. King*, 180 Ariz. 268, 278 (1994); *cf. State v. Bible*, 175 Ariz. 549, 602 (1993) (holding that even if a "comment during opening statement was improper at that point, it was a reasonable inference from evidence later introduced and would have been proper during closing argument," so the defendant was not deprived of a fair trial), *abrogated in part on other grounds as recognized in McKinney v. Ryan*, 816 F.3d 798, 815 (9th Cir. 2015). Likewise, the use of the terms when questioning witnesses largely mirrored the way the victim-witnesses described the events at issue. And in any event, the jury was properly instructed that the lawyers' statements—including their questions to witnesses—were not evidence but rather an aid to understanding the evidence. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006) (jurors presumed to follow court's instructions). Brooks has not shown error in this regard.

### B. Leading Questions.

**¶25** Brooks next argues the State improperly and repeatedly used leading questions on direct examination, couching its questions in a testimonial fashion. Leading questions are those that suggest a desired answer and are generally impermissible on direct examination unless necessary to develop a witness's testimony or where justice otherwise requires. *See* Ariz. R. Evid. 611(c); *State v. Payne*, 233 Ariz. 484, 513, ¶ 119 (2013).

**¶26** Here, Brooks consistently objected to the prosecutor's use of leading questions, and the superior court sustained some objections but overruled others. In large part, the leading questions the court permitted were foundational, reasonable inferences based on the evidence already presented, or were otherwise necessary to develop a witness's testimony. Moreover, the superior court repeatedly reminded the jury that the lawyers' questions were not evidence and could only be considered as context for the witnesses' answers. *See Newell*, 212 Ariz. at 403, ¶ 68. Brooks has not established prosecutorial error.

### C. Closing Arguments.

#### 1. Elements of Burglary.

**¶27** Brooks argues that the State intentionally failed to include the element of entering "unlawfully" when discussing burglary in its closing argument, which he asserts misled the jury and relieved the State of the

burden of proving each element of burglary beyond a reasonable doubt. Burglary in the first degree as alleged in this case required proof that the defendant, while in knowing possession of a firearm, entered or remained unlawfully in a residential structure with the intent to commit a theft. *See* A.R.S. §§ 13-1508(A), -1507(A). During closing argument, the prosecutor described the elements as: "burglary in the first degree requires the defendant enters the residence intending to commit a theft and at some point had a gun. That's it. Those are your elements."

¶28　　　　Although the statement omitted the requirement that the defendant enter (or remain) *unlawfully*, the omission did not establish reversible prosecutorial error. First, the superior court correctly instructed the jury on all elements of the offense as well as the State's burden to prove each element beyond a reasonable doubt. Juries presumed to follow the court's instructions, *see Newell*, 212 Ariz. at 403, ¶ 68, and the court's instructions carry more weight than counsel's arguments. *State v. Vargas*, 251 Ariz. 157, 178, ¶ 76 (App. 2021) (instructions "are viewed as definitive and binding statements of the law," whereas counsel's arguments are presented and viewed as "the statements of advocates" (quotation omitted)). Moreover, after Brooks objected to the omission, the court reminded the jury that "unlawfully" entering was an element of the offense. And even though unlawfulness of entry was not meaningfully contested, Brooks took the opportunity in closing argument to highlight the prosecutor's omission. Brooks thus has not established reversible error in this regard.

### 2.　　Appeal to Emotion.

¶29　　　　Finally, Brooks argues that the State improperly appealed to the jury's sympathy and emotions at two points during closing argument. When the prosecutor argued, "Do you think that [the victims] are ever going to fully heal from this incident?" Brooks objected, and the superior court sustained the objection. The prosecutor then argued, without objection, that "[Michael] was only 21 years old. He did not deserve to die. . . . His life is over." The latter (unobjected-to) statement argued permissible inferences based on the evidence presented and fell within the wide latitude prosecutors are afforded in closing argument. *State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000). And even if the former statement was improper during the guilt phase, the court sustained Brooks's objection to this isolated statement and separately instructed the jury that the lawyers' arguments were not evidence. *See Newell*, 212 Ariz. at 403, ¶ 68. Accordingly, Brooks has not established prosecutorial error based on the prosecutor's closing argument, and he has not established error (individually or collectively)

that was likely to have affected the jury's verdict or otherwise denied him a fair trial. *See Moody*, 208 Ariz. at 459, ¶ 145.

**CONCLUSION**

¶30      For the foregoing reasons, we affirm Brooks's convictions and sentences.

