NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TRAVIS LAVOY ORNER, *Appellant*.

No. 1 CA-CR 15-0580
FILED 9-15-2016

Appeal from the Superior Court in Maricopa County
No. CR2014-144647-001
The Honorable Peter C. Reinstein, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Christopher V. Johns
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Donn Kessler delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Jon W. Thompson joined.

---

**K E S S L E R,** Judge:

**¶1** Travis Lavoy Orner appeals his convictions and sentences for two counts of aggravated assault. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**[1]

**¶2** One afternoon, SR stepped outside of CK's garage to inspect a sudden disruption in electrical service. Orner ambushed SR and then kicked him in the head as he lay on the ground. CK attempted to intervene, but Orner beat him with a jack handle. As Orner was assaulting CK, SR hit Orner in the head with a golf club.

**¶3** Police officer JW responded to a call regarding the altercation. As Officer JW approached the scene, he observed Orner walking away. Orner, CK, and SR were visibly injured. Officer JW briefly handcuffed Orner and searched him for weapons, then emergency medical personnel transported Orner to a nearby hospital.

**¶4** Officer JW arrived at the hospital and, when permitted to do so by Orner's treatment providers, asked Orner questions on three distinct occasions pertaining to the events at CK's home. Before starting the third interview, Officer JW informed Orner of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). During the interviews, Orner made conflicting statements about the positions of the victims relative to his position during the fight and whether he had "anything to swing with."

**¶5** The State charged Orner with two counts of aggravated assault, one a class 3 dangerous felony ("Count 1"), the other a class 6 felony ("Count 2"). Orner moved to suppress the statements he made to Officer

---

[1] We view the facts in the light most favorable to upholding the verdicts and resolve all reasonable inferences against the defendant. *State v. Harm*, 236 Ariz. 402, 404-05 n.2 (App. 2015) (citing *State v. Valencia*, 186 Ariz. 493, 495 (App. 1996)).

JW while in the hospital, but the court denied the motion after an evidentiary hearing. During jury selection, Orner unsuccessfully challenged the State's peremptory strike of potential juror #42 ("#42"), arguing the strike was improper under *Batson v. Kentucky*, 476 U.S. 79 (1986). At trial, the State played recordings of Officer JW's three interviews with Orner for the jury.

¶6 The jury found Orner guilty as charged. As an aggravating factor regarding Count 1—the assault on CK—the jury found the State proved beyond a reasonable doubt that the offense involved the use, threatened use, or possession of a dangerous instrument during the commission of the offense. The court imposed presumptive concurrent terms of imprisonment. Orner timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

I. *Batson* Challenge

¶7 Orner argues the court erred in denying his *Batson* challenge. We disagree.

¶8 "A *Batson* challenge proceeds in three steps: (1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination." *State v. Roque*, 213 Ariz. 193, 203, ¶ 13 (2006) (internal quotation marks and citations omitted). The third step is fact-intensive; the trial court evaluates the credibility of the State's proffered explanation, considering factors such as "the prosecutor's demeanor . . . how reasonable, or how improbable, the explanations are[,] and . . . whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *State v. Newell*, 212 Ariz. 389, 401, ¶ 54 (2006). "Implausible or fantastic justifications may (and probably will) be found to be pretext[ual]." *Newell*, 212 Ariz. at 401, ¶ 54 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

¶9 "We review a trial court's decision regarding the State's motives for a peremptory strike for clear error." *Roque*, 213 Ariz. at 203, ¶ 12. Absent extraordinary circumstances, "[w]e give great deference to the trial court's ruling, based, as it is, largely upon an assessment of the

prosecutor's credibility." *Id.* at ¶ 13. We review the trial court's application of the law de novo. *State v. Lucas*, 199 Ariz. 366, 368, ¶ 6 (App. 2001).

**¶10** During voir dire, #42, along with the other potential jurors, informed the court and the parties of his employment, whether he was married and had children, and whether he served on a jury before. He also raised his hand, as did five others, to the court's question posed to the panel: "[W]ho would vote not guilty right now[?]"

**¶11** After Orner raised his *Batson* challenge, the court asked the State to give a race-neutral explanation for the strike, and the prosecutor responded, "[W]e had very little information on [#42]." The State indicated it had also struck two other potential jurors based on the limited information they revealed during voir dire.

**¶12** By asking for a "race-neutral" explanation, the court implicitly found that Orner met his initial burden to make a prima facie case of intentional discrimination based on race.[2] *State v. Bustamante*, 229 Ariz. 256, 261, ¶ 16 (App. 2012). As for the second step of the *Batson* analysis, the State's proffered explanation for the strike—having little information about #42—is facially race-neutral. *State v. Harris*, 184 Ariz. 617, 620 (App. 1995). And, by denying Orner's *Batson* challenge and impaneling the jury, the court implicitly found Orner failed to establish that the State's explanation was a pretext for purposeful discrimination. *Id.* This implicit determination "properly rested on an assessment of the prosecutor's credibility." *Id.*

**¶13** Nonetheless, Orner contends the State engaged in racial discrimination because the State did not strike some (apparently white) jury members who similarly divulged little information during voir dire. We cannot address this contention, however, because the record does not reveal the racial composition of the venire panel or the jury, let alone the race of other panel members stricken by the State. *See State v. Decker*, 239 Ariz. 29, 32, ¶ 10 (App. 2016) (recognizing that although "'lack of general information' is generally an unpersuasive rationale for striking a prospective juror," the rationale alone does not show purposeful racial discrimination). Orner also argues the prosecutor "misled" the court by stating the only information known about #42 was his biographical information, when, in fact, #42 had responded to the court's question regarding Orner's guilt before evidence had been presented. We do not discern any intention to mislead the court; indeed, the court was

---

[2] In his opening brief, Orner refers to #42 as "nonwhite." We note, however, that nothing in the record indicates #42's race.

presumably aware of #42's response because it noted #42's answer to the question regarding guilt. Finally, we reject Orner's assertions that, to survive his *Batson* challenge, the prosecutor was required to (1) question #42 more thoroughly, and (2) establish "some relationship" between this case and the reason for striking #42. *See Purkett*, 514 U.S. at 769 (explaining "legitimate reason" behind a peremptory strike need not be "a reason that makes sense, but a reason that does not deny equal protection.").

¶14 On this record, and based on the deference properly afforded the trial court in its evaluation of the prosecutor's credibility, Orner has not shown the clear error required to reverse the trial court's denial of his *Batson* challenge.

II. Motion to Suppress

¶15 Orner argues the trial court erred in denying his motion to suppress. We review a trial court's ruling on a motion to suppress a defendant's inculpatory statements for an abuse of discretion. *Newell*, 212 Ariz. at 396 n.6, ¶ 22. In conducting such a review, we consider only the evidence presented at the suppression hearing, and we view that evidence in a light most favorable to upholding the court's ruling. *Id.* at ¶ 22; *State v. Hyde*, 186 Ariz. 252, 265 (1996). We defer to the trial court's determinations of an interrogator's credibility and the reasonableness of the interrogator's inferences. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118 (1996). But we review the trial court's ultimate legal conclusion de novo. *Id.*

¶16 Orner first contends the statements made before Officer JW read him his *Miranda* rights occurred while he was in custody and were therefore inadmissible. *Miranda* requires the police to warn suspects who are in custody of their rights before initiating questioning. *State v. Spears*, 184 Ariz. 277, 286 (1996) (citing *Miranda*, 384 U.S. at 444). Consequently, as Orner properly observes, the threshold issue is whether he was in custody when questioned the first two times by Officer JW at the hospital.

¶17 *Miranda* warnings are required "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "Custody" as used in *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). As relevant here, "custody" means either a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)).

¶18        In determining whether a person is in custody for purposes of *Miranda*, the court considers all the circumstances of the interrogation to determine whether a reasonable person would have felt deprived of his or her freedom "in a significant way." *State v. Morse*, 127 Ariz. 25, 28 (1980). Relevant factors include the location and duration of the questioning, statements made during the questioning, the presence or absence of physical restraints and whether the person was released at the end of questioning. *Howes*, 132 S. Ct. at 1189.

¶19        The evidence from the suppression hearing shows Officer JW did not accompany Orner to the hospital, and when they both arrived at the emergency room "roughly around the same time," Officer JW stood off to the side so hospital staff could commence treating Orner's head wound. Officer JW did not know whether Orner was a suspect, victim, or witness.

¶20        When staff informed Officer JW he could speak to Orner, he did so, saying, "Look, I need to know the basics of what happened, what transpired, and how did we get to this point." Orner replied that he was at CK's to check on personal property he had stored there, and when he arrived, a fight ensued involving people swinging weapons at each other.

¶21        A nurse returned to continue treatment, and Officer JW contacted officers who were interviewing the others involved in the altercation. Officer JW learned that, according to the other subjects, Orner was not "welcome at [CK's residence,]" and Orner instigated the fight.

¶22        Still not certain who the initial aggressor was, Officer JW returned to Orner's bedside to clarify what happened. Orner gave a more detailed description of the altercation, which, according to him, ended when he was hit in the head with an object before retreating and calling 9-1-1.[3] Orner claimed he "may have hit one of them," but he was not certain because he "was just swinging." The first two interviews lasted between eight and fifteen minutes, and Officer JW did not know "who was telling the truth" as between Orner on the one hand, and CK and SR on the other.

¶23        Medical staff returned to Orner to begin scanning and taking X-rays of his head, and Officer JW again contacted the officers interviewing the other subjects. During this conversation, the officers discussed evidence collected at the scene and the inconsistencies between Orner's and the other

---

[3]        According to the record, Orner called 9-1-1 two minutes after one of the victims did so.

subjects' description of the altercation. Based on this information, Officer JW and the other officers suspected Orner was the initial aggressor.

¶24 Orner completed his scans and X-rays and returned to his room where Officer JW read him his *Miranda* rights. Orner agreed to answer questions, and he repeated "essentially the same story." Officer JW waited for Orner to be discharged from the hospital before arresting him.

¶25 The foregoing demonstrates that Orner was not in custody while he was in the hospital and being interviewed by Officer JW. Officer JW was the only officer present, and no evidence was presented showing JW restrained Orner at the hospital (or that Orner was restrained at all). No evidence revealed that Officer JW exhibited undue force, made threatening comments or promises, or engaged in any activity that could have overborne Orner's will. Officer JW had not indicated that Orner was suspected of assaulting CK and SR, had not told Orner he was under arrest, and the questioning was not prolonged. Rather, Officer JW's questioning amounted to nothing more than a short investigation. Merely responding, while hospitalized and unrestrained, to a police officer's questions regarding a possible crime does not alone rise to the level of custodial interrogation for purposes of *Miranda*. *See State v. Tucker*, 557 A.2d 270, 272 (N.H. 1989) (noting majority of courts have determined police must impose a restraint on defendant's freedom of movement in hospital to implicate *Miranda*). Under these circumstances, no reasonable person would believe she was deprived of her freedom in a significant way. Orner, therefore, was not in custody, and no *Miranda* violation occurred.

¶26 Orner also argues that the three separate interviews amounted to a "three-stage ploy to obtain inculpatory statements," thereby rendering the statements made after Officer JW informed him of his *Miranda* rights inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004).

¶27 We have previously described the two-stage interrogation technique prohibited by *Seibert* as follows:

> In the first stage, police interrogate a person in custody without having given the person his *Miranda* warnings and the person has made statements in response to that questioning. Then, in the second stage, the police give the person his *Miranda* warnings, the person waives his right to remain silent and the person repeats his prior statements in response to the police repeating the questions or lines of questions asked prior to the *Miranda* warnings being given.

*State v. Zamora*, 220 Ariz. 63, 66 n.2, ¶ 1 (App. 2009) (citing *Seibert*, 542 U.S. at 604). As we noted in *Zamora*, the two-stage interrogation technique prohibited by *Seibert* exists only when *Miranda* is violated initially. *Id*. at ¶ 1. Because *Miranda* was not violated during Orner's first two interviews, *Seibert* does not apply.

**¶28** For the foregoing reasons, the trial court properly denied Orner's motion to suppress.

## CONCLUSION

**¶29** For the foregoing reasons, we affirm Orner's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA