16 P.3d 214

**STATE of Arizona, Appellee,**

v.

**Anthony Steven ANDERSON, Appellant.**

**No. 1 CA–CR 99–0840.**

Court of Appeals of Arizona, Division 1, Department D.

Dec. 21, 2000.

---

Janet Napolitano, Attorney General By Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and James P. Beene, Assistant Attorney General, Phoenix, for Appellee.

Neal W. Bassett, Phoenix, for Appellant.

## OPINION

WEISBERG, Judge.

¶ 1 Anthony Steven Anderson ("defendant") appeals his convictions and sentences for stalking, a class 3 felony; threats and intimidation, a class 1 misdemeanor; criminal damage, a class 2 misdemeanor; attempted aggravated assault, a class 4 felony; and aggravated assault, a class 4 felony. For the

following reasons, we affirm defendant's convictions but remand for resentencing.

## FACTS

¶ 2 Defendant was charged with multiple counts arising out of various incidents involving his wife, Soyini Anderson, over the course of several months. The jury heard evidence that on December 31, 1998, the couple got into a fight because Soyini wanted defendant to leave the house. The altercation that followed resulted in Soyini's suffering a dislocated toe. At the time, she told police that defendant had picked her up by the throat and thrown her down causing the injury. She later told others that she had provoked the argument and that, while defendant was restraining her, she had tried to kick him but had hit the wall instead, hurting her toe. At trial, Soyini denied the original version of events that she had told the police. Soyini also testified that she did not fear defendant after the incident.

¶ 3 Defendant left that night for California where he remained until mid-February. Records showed that Soyini called defendant in California approximately thirty-one times during early February.

¶ 4 Defendant returned on or about February 20, 1999, whereupon the two got into another argument. Defendant punched Soyini in the head and then got on top of her and choked her. Although, at trial, Soyini denied losing consciousness during the assault, she did recall defendant performing mouth-to-mouth resuscitation on her. She also stated that she feared for her life during this attack, but when asked if her fear was the reason she did not promptly report the incident, she responded, "I don't think so." When asked if she told the police that she had feared for her life, she responded "I don't know."

¶ 5 Soyini subsequently left their home. She testified that she left because of "problems" but acknowledged that she might have told police that she was hiding. Although others testified that Soyini was afraid, she stated she did not know whether she left because she was afraid or because her relationship with her husband had ended.

¶ 6 On March 6, 1999, Vivian Harris, Soyini's mother, went to Soyini's house to collect some clothes for Soyini and her children. The home had been broken into and clothes strewn both inside and outside the house. Someone had urinated on some of the clothes in the living room. Soyini's wedding dress was staked to the garage wall with a knife, a photograph of Harris had a knife stuck between the eyes, and framed photographs of Soyini's son by a previous relationship were broken. Pictures of Soyini's other son, defendant's child, were not damaged. The telephone and caller I.D. box were broken, and "punk bitch" was carved into one of the doors.

¶ 7 In addition, defendant had left messages on Soyini's answering service telling her that he knew where she and her mother worked, that he could be hiding in a closet or on the roof and would jump her, cut off her hair, beat her, and kill her. He stated in one message that he had been in the house and had torn it up. Soyini's mother testified that Soyini was afraid because of the messages. Soyini testified that she did not listen to all of the messages but that they sounded threatening. When asked if she was afraid that defendant would carry out the threats, she responded that she was not sure at the time, but thought there was a possibility. Soyini erased the messages at the suggestion of defendant's mother, so they were not available at trial.

¶ 8 Evidence was presented that at approximately the same time as the damage occurred to her house, Soyini called Glendale Police. Officer Livingston testified that he was asked to contact Soyini by telephone because she was afraid that if he contacted her in person defendant would retaliate. Soyini told the officer that on March 4 defendant had threatened to beat her up badly or kill her and that defendant had said that if he were arrested he would simply be released and then come after her. Soyini also told Officer Livingston that on March 6 defendant called Soyini and told her that if she were not back home by 9:30 that morning he would beat her like he had never beaten her before and that he would burn the house and throw her clothes outside.

¶ 9 At trial, Soyini said she could not remember what she had talked about with Officer Livingston, but thought she probably did tell him about the threat of the beating. She also testified that at that time she did not feel she could safely return home.

¶ 10 On March 8, 1999, at about 10:30 p.m., Soyini went to the apartment of Mark Jamerson, a friend of both defendant and hers. She brought two handguns, one she had been given by her mother and one she had just purchased. She testified that she had the guns because she "just never knew what was going to happen." When asked if she meant this in connection to anything or any person, she responded "General." About 11:30 p.m., when Jamerson opened the door to leave the apartment, defendant was standing outside and appeared angry. Defendant entered the apartment, went directly to Soyini, and began hitting her. After the first blow, Jamerson picked up one of Soyini's guns. Although Jamerson's view was obstructed, he heard Soyini screaming. Because he feared that defendant would kill Soyini, he yelled to defendant to stop and then shot him. Jamerson then left the apartment with the gun and told neighbors to call the police.

¶ 11 Soyini testified that the beating "really started" after defendant was shot and that he "threw" her around the kitchen, bit her face, and injured her nose. When defendant finally left the apartment, Soyini followed him with the second gun, firing several shots. When police arrived, they found Soyini covered in blood and the kitchen smeared throughout with blood. She told them that defendant had punched her in the face, smashed her face into the kitchen cabinets, sink and wall, tried to dig his fingernails into her jugular vein, bit the left side of her cheek, and tried to choke her. Soyini suffered a broken nose, a laceration on the nose that required seven stitches, and an abrasion on her cheek consistent with a bite mark. Concerning this assault, Soyini testified that she did not think defendant would have killed her, but that he just had assaulted her "badly."

¶ 12 Defendant was acquitted of two counts of aggravated assault arising out of the incidents that occurred on December 31, 1998 and February 20, 1999. With respect to the March 8, 1999 incident, he was acquitted of attempted murder but convicted in the alternative of attempted aggravated assault for trying to cause a serious physical injury. He also was convicted of aggravated assault based on the broken nose Soyini suffered in the March 8, 1999 incident. Defendant was also found guilty of stalking and of misdemeanor counts of criminal damage and threats and intimidation.

¶ 13 Defendant admitted to having two prior felony convictions and to being on parole at the time of the offenses. The trial court sentenced him to aggravated terms of thirteen years in prison for stalking, twelve years for attempted aggravated assault, and twelve years for aggravated assault. The court also sentenced him to six months in jail for threats and intimidation and four months for criminal damage. The court directed that all sentences be served concurrently. Defendant timely appealed. We have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes Annotated ("A.R.S.") sections 12–120.21(A)(1)(1992), 13–4031(1989), and 13–4033(A)(Supp.1999).

## ISSUES

A. Is A.R.S. section 13–2923 (Supp.1999) unconstitutionally vague because it designates the same proscribed conduct as both a class 3 felony and a class 5 felony, thereby allowing for arbitrary enforcement?

B. Did the trial court err by allowing two misdemeanor charges to be decided by the jury rather than by the court?

C. Did the trial court err by failing to advise defendant of the consequences of his admitting prior felony convictions and to having committed the subject offenses while on release?

D. Did the trial court err in sentencing by not considering as a mitigating factor the injury that defendant incurred during the commission of one of the subject offenses?

## DISCUSSION

### A.R.S. Section 13–2923

■ ¶ 14 Defendant argues that the stalking statute, A.R.S. section 13–2923, is unconstitutionally vague because the conduct proscribed by subsection (A)(2), a class three felony under which defendant was convicted, is indistinguishable from the conduct proscribed by subsection (A)(1), a class 5 felony. Although defendant did not raise this issue in the trial court, we may consider a vagueness challenge for the first time on appeal. *See State v. Ochoa*, 189 Ariz. 454, 459, 943 P.2d 814, 819 (App.1997). We choose to do so here.

■ ¶ 15 A statute is unconstitutionally vague if it does not provide persons of ordinary intelligence reasonable notice of prohibited behavior and if it "fails to provide explicit standards for those who apply it," allowing for arbitrary and discriminatory enforcement. *State v. Tocco*, 156 Ariz. 116, 118, 750 P.2d 874, 876 (1988) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). A defendant has standing to challenge a statute as vague only if that defendant has suffered a threatened or actual injury because of the alleged vagueness. *State v. Lefevre*, 193 Ariz. 385, 389, ¶ 16, 972 P.2d 1021, 1025 (App.1998). However, with the exception of challenges based on First Amendment grounds, a defendant whose conduct clearly falls within the legitimate purview of the statute has no standing to challenge the statute as vague. *See State v. Steiger*, 162 Ariz. 138, 144–45, 781 P.2d 616, 622–23 (App.1989).

■ ¶ 16 The stalking statute, A.R.S. section 13–2923, states in pertinent part:

A. A person commits stalking if the person intentionally or knowingly engages in a course of conduct that is directed toward another person and if that conduct either:

1. Would cause a reasonable person to fear for the person's safety or the safety of that person's immediate family member and that person in fact fears for their safety or the safety of that person's immediate family member.

2. Would cause a reasonable person to fear physical injury to or death of that person or that person's immediate family member and that person in fact fears physical injury to or death of that person or that person's immediate family member.

B. Stalking under subsection A, paragraph 1 of this section is a class 5 felony. Stalking under subsection A, paragraph 2 is a class 3 felony.

C. For the purposes of this section:

1. "Course of conduct" means maintaining visual or physical proximity to a specific person or directing verbal, written or other threats, whether express or implied, to a specific person on two or more occasions over a period of time, however short, but does not include constitutionally protected activity.

¶ 17 Defendant contends that the conduct proscribed by subsection (A)(1), to wit: conduct that would cause, and in fact does cause, a reasonable person "to fear for the person's safety" is indistinguishable from the conduct proscribed by subsection (A)(2), to wit: conduct that would cause, and in fact does cause, a reasonable person "to fear physical injury [ ] or death." Defendant argues that there is no meaningful difference between fearing for one's own safety and fearing physical injury or death. Therefore, defendant argues, enforcement of the statute is arbitrary because the statute has provided no explicit guidelines as to the type of offense that constitutes a class 5 felony, under subsection (A)(1), as opposed to a class 3 felony, under subsection (A)(2). In response, the State argues both that defendant lacks standing to raise the issue because his conduct is clearly prohibited by subsection (A)(2) and that the types of conduct proscribed by the two subsections are distinguishable.

¶ 18 Subsection (A)(2) proscribes two types of conduct—that which causes fear of physical injury and that which causes fear of death. Defendant asserts that fearing for one's safety is indistinguishable from both fearing physical injury and fearing death. But fearing death is not identical with fearing for one's safety. Fearing death and the conduct that would evoke such a reaction is

much more extreme. Consequently, if defendant's conduct would have caused a reasonable person to fear death, as opposed to physical injury, and in fact caused Soyini Anderson to fear death, then defendant's conduct would fall only within the parameters of subsection (A)(2), and he would lack standing to allege the vagueness of the remainder of the statute.

¶ 19 We recognize that evidence was presented from which a jury could have concluded that defendant's conduct would have caused a reasonable person to fear death and that, in fact, it caused Soyini to fear death. However, given the victim's testimony and the resulting verdicts, we cannot conclude that the jury did not reject that view of the facts and instead convict defendant only under the portion of subsection (A)(2) that refers to fear of physical injury.

¶ 20 Despite what she had told the police officers, Soyini did not testify that defendant's conduct made her fear for her life at any time other than during the February 20 incident, for which defendant was acquitted. Instead, she testified that between December and March she came to fear that defendant might injure her. With regard to the March 8, 1999 beating, she told the jury that she did not think that defendant would have killed her. Much of her testimony consisted of her responding that she could not remember or did not know the answer to the question asked.

¶ 21 Furthermore, the jury acquitted defendant of several significant charges. In addition to the charge arising out of the February 20, 1999 incident, it acquitted him of the charge arising out of the December 31, 1998 incident and of the attempted murder charge arising out of the March 8, 1999 beating.

¶ 22 Given the paucity of testimony by the victim that defendant's conduct made her fear for her life and given the jury's acquittals, we cannot find beyond a reasonable doubt that the jury, which could see and hear the witnesses and evaluate the testimony, did not reject either the possibility that a reasonable person would have feared death or that Soyini in fact did so. We therefore cannot conclude that defendant's conduct clearly falls within that portion of subsection (A)(2) dealing with the fear of death. Consequently, defendant does not lack standing to allege that the remainder of subsection (A)(2) is indistinguishable from subsection (A)(1), resulting in arbitrary enforcement of the statute.

¶ 23 In that regard, we agree with defendant that fearing for one's safety is the equivalent of fearing physical injury. We can conceive of no instance in which a reasonable person would fear for his or her safety and not fear physical injury.

¶ 24 "Safety" is defined as "freedom from exposure to danger: exemption from hurt, injury, or loss." Webster's Third New International Dictionary 1998 (1969). Although the term "loss" in the definition suggests something other than physical harm, we do not believe that meaning to apply in the context of the statute. Subsection (A)(1) refers to fear for the "person's safety," implying a relation to the physical well-being of an individual rather than personal property or possessions.

¶ 25 The State hypothesizes that a person threatened with having his or her house burned down might fear for his or her safety but not fear physical injury. We find this unpersuasive. The State does not explain what safety concerns that person could have that would not be concerns for physical injury. We believe that someone threatened with having his or her house burned down and who fears for his or her safety separate and apart from fearing damage to property and possessions would, by definition, fear physical injury.[1]

¶ 26 We therefore conclude that there is no meaningful distinction between the conduct prohibited by A.R.S. section 13–2923(A)(1) and that prohibited by the portion of A.R.S. section 13–2923(A)(2) that proscribes conduct

---

1. The State's further argument that the nature and substance of a defendant's threats and actions should determine the classification of the charge is also unpersuasive given that the State has failed to articulate what types of threats and actions would constitute a class 3 felony as opposed to a class 5 felony.

that would cause a reasonable person to fear physical injury and that actually causes that person to fear physical injury. Consequently, A.R.S. section 13–2923 is unconstitutionally vague to the extent that it permits such conduct to be punished as either a class 3 or class 5 felony.

¶ 27 Where a statute is subject to more than one interpretation, the rule of lenity requires that doubts be resolved in favor of the defendant and against imposing the harsher punishment. *See Cawley v. Arizona Bd. of Pardons & Paroles,* 145 Ariz. 387, 388, 701 P.2d 1195, 1196 (App.1984) *approved as modified,* 145 Ariz. 380, 701 P.2d 1188 (1985). We therefore remand to the trial court for resentencing on this count, which shall be designated as a class 5 felony.

### Submission of Misdemeanor Charges to the Jury

¶ 28 Defendant next argues that defendant's convictions for two misdemeanor offenses must be reversed because the charges were decided by the jury rather than by the court. We disagree.

¶ 29 Defendant was charged with criminal damage, a class 6 felony, in violation of A.R.S. section 13–1602 (Supp.1999), and with threats and intimidation, a class 1 misdemeanor, in violation of A.R.S. section 13–1202 (Supp.1999). Before the close of evidence, the prosecutor advised the court that the criminal damage charge had to be redesignated as a class 2 misdemeanor because the victim had testified that the damage caused was in an amount below the threshold required for designation as a class 6 felony. At no time during the trial did the parties discuss withholding the misdemeanor offenses from the jury.

¶ 30 Defendant now contends that the misdemeanor offenses were not jury eligible and that submitting them to the jury constituted error. Because defendant did not object below, he has waived this issue absent fundamental error. *See State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). Error is fundamental if it goes to the foundation of the defendant's case or denies the defendant a fair trial. *Id.* at 155, 812

P.2d at 628. Assuming without deciding that the misdemeanor offenses in question were not jury eligible and that submitting them to the jury was error, we find no fundamental error.

¶ 31 In Arizona, the right to a trial by jury for serious offenses is guaranteed by Article 2, Sections 23 and 24 of the Arizona Constitution. *State ex rel. Dean v. Dolny,* 161 Ariz. 297, 299, 778 P.2d 1193, 1195 (1989). Defendant claims that he conversely had a "right" to trial by the court on the misdemeanor offenses and that he did not waive that right. Defendant, however, fails to cite any authority, and we have found none, that such a right to trial by the court exists.

¶ 32 Defendant, on appeal, apparently agrees that generally it is preferable for an accused to submit a case to a jury rather than to a judge. Notwithstanding, he argues that trial to the court was preferable here because both the facts of the case and defendant's race prejudiced the jury.

¶ 33 But defendant has failed to demonstrate any prejudice. The evidence of the misdemeanor offenses could not have prejudiced the jury with respect to the felony offenses because such evidence would also have been admissible as evidence of the stalking offense. Also, the felony-related evidence could not have prejudiced the jury in reaching its verdicts on the misdemeanor offenses because defendant presented a witness who testified that defendant admitted causing damage to the victim's home, and defense counsel told the jury in closing argument that "it's pretty clear that he did get mad, and he did mess up the house. There's no question about that." Furthermore, the argument that the jury was inflamed by the prejudicial facts of the case or by defendant's race is undermined by the fact that the jury acquitted defendant of several of the more serious offenses. Defendant therefore has failed to demonstrate that he was prejudiced and denied a fair trial by having the jury, rather than the court, deliberate on the misdemeanor offenses. We find no fundamental error.

**194**

### Defendant's Admissions at Sentencing

¶ 34 For enhancement purposes pursuant to A.R.S. sections 13–604 (Supp.1999) and 13–604.02 (Supp.1999), the State alleged that defendant had three historical prior felony convictions and that he committed the instant offenses while on parole. At sentencing, defense counsel advised the court that defendant would admit the allegations, and the prosecutor read into the record information pertaining to the prior convictions. The trial court asked defendant if he admitted the convictions, the defendant responded in the affirmative and the court found that defendant had admitted the prior convictions. The court followed the same procedure in accepting defendant's admission that he had committed the offenses while on parole.

¶ 35 We review *de novo* whether the trial court properly accepted defendant's admissions. *State v. Stuart,* 168 Ariz. 83, 87, 811 P.2d 335, 339 (App.1990).

¶ 36 Defendant now argues, and the State agrees, that the procedure followed by the trial court was inadequate and requires that the case be remanded for further proceedings. They agree that, before accepting a defendant's admission to a prior conviction, a trial court must advise the defendant of the nature of the allegation, the effect of admitting the allegation on the defendant's sentence, and the defendant's right to proceed to trial and require the State to prove the allegation. *See id;* Ariz. R.Crim. P. 17.2, 17.6. A similar inquiry should be made before accepting a defendant's admission to committing an offense while on release. *See State v. Rickman,* 148 Ariz. 499, 504–05, 715 P.2d 752, 757–58 (1986).

¶ 37 The record reflects that the trial court failed to make the appropriate inquiry of defendant before accepting his admissions. We therefore remand to the trial court for a hearing to determine whether defendant knew from any source the rights he was giving up and the consequences of his admissions. *See State v. Medrano–Barraza,* 190 Ariz. 472, 474–75, 949 P.2d 561, 563–64 (App. 1997). If the trial court determines defendant did not know the effect of his admissions, defendant should be permitted to withdraw his admissions and require the State to prove the allegations. *See Stuart,* 168 Ariz. at 88, 811 P.2d at 340.

### Consideration of "Non-judicial Punishment" in Mitigation

¶ 38 In sentencing defendant, the trial court found no mitigating factors. It also found that the trauma to the victim and the violent nature of the offenses were aggravating factors. Defendant argues that the trial court was required to consider the fact that he was shot during his March 8 assault on the victim as "non-judicial punishment" in mitigation of his sentence. Defendant contends that the trial court's failure to do so requires remanding to the trial court for resentencing. We disagree.

¶ 39 We review a trial court's sentence within statutory limits for abuse of discretion. *State v. Fillmore,* 187 Ariz. 174, 184, 927 P.2d 1303, 1313 (App.1996). A court's sentencing decision may constitute an abuse of discretion if it is arbitrary or capricious or if "the court fail[ed] to conduct an adequate investigation into the facts relevant to sentencing." *Id.*

¶ 40 Arizona Revised Statutes Annotated section 13–702(D) (Supp .1999) sets forth four factors that the trial court must consider in mitigation when sentencing a defendant. "Non-judicial punishment" is not one of them. Under A.R.S. section 13–702(D)(5), the trial court may consider any other factor it deems "appropriate to the ends of justice," but it is not required to consider any other specific factor. The court heard the evidence at trial and therefore was aware that defendant had been shot during the commission of one of the offenses. The court could have considered this factor in mitigation if it had deemed it appropriate. However, the trial court was not *required* to consider this factor as a mitigating factor. We therefore find no abuse of discretion.

### CONCLUSION

¶ 41 We reduce defendant's stalking conviction to a class 5 felony and remand for

resentencing on it. We also remand for a hearing to determine whether defendant was aware of the consequences when he admitted to having prior felony convictions and to having committed the instant offenses while on release. All other convictions and sentences are affirmed, and we remand to the trial court for further proceedings consistent with this opinion.

CONCURRING: WILLIAM F. GARBARINO, Judge, and SUSAN A. EHRLICH, Judge.