NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JEOFREY MUTINDA KAVU, *Appellant*.

No. 1 CA-CR 18-0122
FILED 4-16-2019

Appeal from the Superior Court in Maricopa County
No.  CR2015-125712-001
The Honorable Douglas Gerlach, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Debus Kazan & Westerhausen LTD, Phoenix
By Tracey Westerhausen
*Co-Counsel for Appellant*

DM Cantor, Phoenix
By Michael Alarid, III
*Co-Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge James P. Beene delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Kent E. Cattani joined.

---

**B E E N E**, Judge:

¶1         Jeofrey Kavu appeals his convictions and sentences for negligent homicide and endangerment.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

¶2         After nightfall on a summer evening, R.F. and L.V. embarked on a lengthy walk, pushing a shopping cart along a bicycle lane.  At some point, R.F. heard screeching tires and turned to see a fast-moving vehicle swerving in their direction.  Although R.F. instinctively tried to pull L.V. out of danger, the car struck her, propelling her several feet into a ditch adjacent to the road.

¶3         As the car drove away, R.F. searched in the dark for L.V., calling her name.  He found her lying face-down in dirt, choking on her own blood.  While yelling for help, R.F. lifted L.V.'s body and leaned her against a traffic sign.

¶4         A nearby resident heard R.F.'s pleas and called for emergency assistance.   By the time paramedics arrived, however, L.V. was unresponsive and pronounced dead.

¶5         Responding police officers assessed the debris strewn about the scene and then surveyed the surrounding area for the gray vehicle that had been involved in the collision.  While searching an apartment complex parking lot in the vicinity, Officer Ryan McDowell located a gray Lexus with "extensive front-end damage," two deployed air bags, two flat tires, and a partially missing side mirror.  The engine was "still warm." Suspecting he had found the collision vehicle, Officer McDowell secured

---

[1]     We view "the facts in the light most favorable to sustaining the verdict."  *See State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

the area and ran a license-plate check on the Lexus, which was registered to Kavu's father.

¶6        Meanwhile, Officer Geoffrey Ballentine searched the exterior of the apartment complex and found a bar receipt issued earlier in the evening that bore Kavu's name.  After printing a motor vehicle department photograph of Kavu, the officer knocked on an apartment door near where he had found the bar receipt.  No one answered, so the officer waited outside.

¶7        At some point, a woman exited a neighboring apartment door and Officer Ballentine approached her with the photograph, which she immediately recognized as Kavu.  When the woman stated that Kavu was in her apartment, the officer asked her to summon him outside.  She complied and Kavu quickly emerged and identified himself.  Observing that Kavu had watery eyes and smelled of alcohol, Officer Ballentine placed him under arrest.  In a search incident to that arrest, the officer located a credit card inside Kavu's pocket that corresponded to the bar receipt he had found.

¶8        Once Kavu was in custody and searched, an officer transported him to a police station where he was advised of his *Miranda*[2] rights and asked about the collision.  Denying any involvement, Kavu claimed that he had been home the entire evening and had not permitted anyone to use his car.

¶9        During an ensuing police investigation, officers determined that the debris recovered from the scene of the collision corresponded to the damage and missing parts from Kavu's Lexus.  An accident reconstruction found the Lexus had been traveling at more than seventy miles per hour when it veered into the bike lane and struck L.V. and the cart, notwithstanding the posted speed limit of forty miles per hour.  Furthermore, investigating officers obtained a second bar receipt from the evening in question that likewise bore Kavu's name.

¶10        As presented to a jury,[3] the State charged Kavu with one count of manslaughter (Count 1), one count of leaving the scene of a fatal-

---

[2]        *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]        In the original indictment, the State charged Kavu with a second count of manslaughter, alleging he had caused the death of L.V.'s unborn

injury accident (Count 2), and one count of endangerment (Count 3). After a nine-day trial, the jury convicted Kavu of endangerment and the lesser-included offense of negligent homicide (Count 1) but acquitted him of leaving the scene of a fatal-injury accident. The superior court sentenced Kavu to an aggregate term of seven years' imprisonment and he timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I. Denial of *Batson*[4] Challenge.

¶11 Arguing the superior court erred by denying his *Batson* challenge, Kavu contends that the prosecutor's exercise and waiver of peremptory strikes were racially motivated.

¶12 During jury selection, the superior court asked the prospective jurors whether they felt able to judge another person's criminal culpability. In response, Juror No. 18 stated that she would find it difficult to judge someone and did not "want to do it." When the court explained that the jurors would be given certain facts and evidence to evaluate, Juror No. 18 remained reluctant, twice commenting, "It's like playing God." Juror Nos. 96 and 105 expressed similar reticence over a decision that could "put somebody in prison."

¶13 When defense counsel subsequently conducted *voir dire* of the jurors, he revisited the issue and asked Juror Nos. 18 and 96 to further explain their disinclination to serve. Restating her position, Juror No. 96 stated that she viewed the "prison system" as "inhumane" and did not feel that she could decide criminal culpability without considering the corresponding sentence that would be imposed. Juror No. 18 expressed a more specific objection, stating she could evaluate the evidence of culpability, but was not willing to decide the punishment.

¶14 Without objection, Juror Nos. 96 and 105 were dismissed for cause. When the prosecutor moved to dismiss Juror No. 18 for cause, however, defense counsel objected, asserting the juror had been rehabilitated and could fairly and objectively evaluate the evidence. Although the prosecutor countered that Juror No. 18 had simply agreed

child. On the State's motion, however, the superior court dismissed that count without prejudice.

4      *Batson v. Kentucky*, 476 U.S. 79 (1986).

with defense counsel's "carefully worded question," the superior court concurred with defense counsel and denied the State's request.

¶15 After the prosecutor exercised his peremptory challenges, electing to strike only five jurors, defense counsel raised a *Batson* challenge, arguing that the State "direct[ly]" struck a minority juror, Juror No. 18, and "indirect[ly]" struck another minority potential juror, Juror No. 50, who was next in line to be empaneled if the State had used its remaining peremptory challenge. The superior court summarily dismissed defense counsel's challenge to Juror No. 50, explaining a party is not required to exercise each of his allotted strikes.

¶16 With respect to Juror No. 18, however, the court invited the prosecutor to respond. Noting he had previously moved to strike Juror No. 18 for cause, the prosecutor stated that he exercised a peremptory strike to remove Juror No. 18 because she had acknowledged that she was unable to judge another person's culpability. When defense counsel countered that other prospective jurors had likewise expressed reluctance to sit in judgment, the prosecutor explained that those jurors were numerically unlikely to be empaneled. Agreeing with the State and noting that Juror No. 18 was the only prospective juror to "invok[e] God," the court denied Kavu's *Batson* challenge to Juror No. 18.

¶17 Using peremptory strikes to exclude potential jurors solely based on race violates the Equal Protection Clause of the Fourteenth Amendment. *State v. Newell*, 212 Ariz. 389, 400, ¶ 51 (2006) (citing *Batson*, 476 U.S. at 89). We will uphold the denial of a *Batson* challenge absent clear error. *Newell*, 212 Ariz. at 400, ¶ 52. Because the superior court is in the best position to assess a prosecutor's credibility, which is a primary factor in evaluating the State's motive for exercising a peremptory strike, we extend great deference to the court's ruling. *Id.* at 401, ¶ 54.

¶18 "To successfully challenge a peremptory strike, a party must set forth a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *State v. Paleo*, 200 Ariz. 42, 43, ¶ 6 (2001) (internal quotation omitted). "The burden of production then shifts to the opponent who must explain adequately the racial exclusion." *Id.* (internal quotation omitted). "The court then evaluates the facts to determine whether a party engaged in purposeful discrimination." *Id.* at 44, ¶ 6. "Throughout the process, the burden of persuasion remains on the party alleging discrimination." *Id.*

¶19   Applying this framework to the State's peremptory strike of Juror No. 18, the superior court implicitly found that Kavu had met his initial burden and set forth a prima facie case of racial discrimination. *See State v. Bustamante*, 229 Ariz. 256, 261, ¶ 16 (App. 2012) ("By asking the prosecutor for a race-neutral explanation for the strike, the judge implicitly found that defendant had met his initial burden to make a prima facie case of intentional discrimination."). The prosecutor, in turn, explained that he believed Juror No. 18 should have been struck for cause due to her manifest reluctance to judge another person, thereby providing a race-neutral basis for exercising the peremptory strike. When defense counsel countered that other prospective jurors had expressed a similar reticence to serve, the prosecutor differentiated those jurors by explaining they fell outside the strikable range. Equally important, though not expressly relied upon by the prosecutor, Juror Nos. 96 and 105 had already been struck for cause. Because Kavu failed to present any evidence that the prosecutor's peremptory strike of Juror No. 18 was the result of purposeful discrimination, and there is no basis on this record for concluding the prosecutor's race-neutral reason for the strike was pretext, the superior court did not clearly err by concluding the State's peremptory strike of Juror No. 18 did not violate *Batson*.

¶20   Turning to Juror No. 50, Kavu argues the prosecutor's waiver of a peremptory strike, which left a minority juror unseated, was predicated on racial discrimination. "Peremptory challenges are a matter of discretion for each party and may be used, or not, for any non-discriminatory reason." *Paleo*, 200 Ariz. at 45, ¶ 11. Because "[t]he law does not presume wrongdoing without action of some kind or omission of a legally required act," a waiver of a peremptory strike, alone, is "insufficient to create an inference of discriminatory purpose." *Id.* at 44, ¶ 8. Nonetheless, waiver may be "a relevant circumstance in establishing a prima facie case of discrimination because those of a mind to discriminate could manipulate the rules to prevent the seating of minority jurors." *Id.* at ¶ 10 (internal quotation omitted). To establish a prima facie case, the party challenging the waiver of an allotted peremptory strike must put forward evidence that racial discrimination prompted the waiver. *Id.* at 45, ¶ 11.

¶21   Here, defense counsel simply cited the prosecutor's waiver of a peremptory strike and his exercise of a peremptory strike against Juror No. 18 to establish a prima facie case of racial discrimination. Because no evidence suggests that Juror No. 18 was struck for a discriminatory purpose, however, defense counsel failed to make the requisite showing of waiver "accompanied by something more." *Id.* at 44, ¶ 10. On this record,

the superior court did not clearly err by summarily concluding the State's waiver of a peremptory strike did not violate *Batson*.

## II.     Admission of Expert Testimony.

**¶22**          Kavu argues the superior court improperly allowed a surrogate medical examiner (Dr. Philip Keen) to testify regarding the victim's autopsy in lieu of the medical examiner who performed the autopsy but was no longer employed by the medical examiner's office at the time of trial (Dr. Michael Ferenc).  Specifically, Kavu contends he was denied his constitutional right to confront a witness against him when the contents of Dr. Ferenc's autopsy report were introduced through Dr. Keen's expert testimony.

**¶23**          Several months before trial, the prosecutor notified the superior court that Dr. Ferenc had moved out of state and was no longer responding to State inquiries.  Accordingly, the prosecutor hired Dr. Keen to replace Dr. Ferenc at trial and provided him with the autopsy report as well as other relevant medical records.

**¶24**          In response, Kavu moved to preclude Dr. Keen's testimony, asserting Dr. Keen would simply "act[] as a conduit" to introduce Dr. Ferenc's findings and opinions in violation of the Confrontation Clause.  At a hearing on the motion, Dr. Keen testified that he had reviewed Dr. Ferenc's reports and photographs but formulated his own independent conclusions regarding the victim's cause of death.  Based on this representation, the superior court denied Kavu's motion and held that Dr. Keen could testify regarding his independent opinions.

**¶25**          "The Confrontation Clause bars admission of out of court testimonial evidence unless the defense has had an opportunity to cross-examine the declarant."  *State v. Parker*, 231 Ariz. 391, 402, ¶ 38 (2013) (citing *Crawford v. Washington*, 541 U.S. 36, 38 (2004)).  "Testimonial evidence is *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."  *Id.* at 402-03, ¶ 38 (quoting *Crawford*, 541 U.S. at 51).  We review *de novo* evidentiary rulings that implicate the Confrontation Clause.  *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006).

**¶26**          The supreme court has repeatedly and uniformly held that "a testifying medical examiner may, consistent with the Confrontation Clause, rely on information in autopsy reports prepared by others as long as he

forms his own conclusions." *State v. Dixon*, 226 Ariz. 545, 553, ¶ 36 (2011); *see also State v. Joseph*, 230 Ariz. 296, 298, ¶ 8 (2012) ("[A] testifying medical examiner may offer an opinion based on an autopsy performed by a non-testifying expert without violating the Confrontation Clause."); *State v. Smith*, 215 Ariz. 221, 228, ¶ 23 (2007) ("Expert testimony that discusses reports and opinions of another is admissible under this rule if the expert reasonably relied on these matters in reaching his own conclusion."). A testifying expert may not, however, act as a "conduit for another non-testifying expert's opinion." *State v. Lundstrom*, 161 Ariz. 141, 148 (1989).

**¶27**      In this case, the autopsy report prepared by Dr. Ferenc was not admitted at trial. Instead, Dr. Keen testified on behalf of the medical examiner's office and stated his opinions regarding the circumstances and cause of L.V. 's death. Although Dr. Keen reviewed photographs, medical records, and the autopsy report in preparation for trial, and referred to the autopsy report while presenting his testimony, he used this information to reach his own conclusions regarding the nature of L.V.'s injuries (blunt force trauma) and the cause of her death (motor vehicle). After Dr. Keen presented his opinions, Kavu had the opportunity to confront and cross-examine him. *See State v. Rogovich*, 188 Ariz. 38, 42 (1997) (explaining "the defendant's confrontation right extends to the testifying expert witness, not to those who do not testify but whose findings or research merely form the basis for the witness's testimony"). Thus, Dr. Keen was not a mere conduit for the opinions of the prior medical examiner.

**¶28**      Nonetheless, relying on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), Kavu argues the admission of surrogate testimony violates the Confrontation Clause. Kavu's reliance on *Melendez-Diaz* and *Bullcoming* is misplaced, however, because those cases involved the admission of testimonial documents. *Melendez-Diaz*, 557 U.S. at 311; *Bullcoming*, 564 U.S. at 662-65. Here, even assuming the autopsy report was testimonial, it was not admitted into evidence and Dr. Keen testified regarding his independent opinions, not the conclusions set forth in the report. *See Joseph*, 230 Ariz. at 298-99, ¶ 10; *State v. Snelling*, 225 Ariz. 182, 187, ¶ 21 (2010). Therefore, no Confrontation Clause violation occurred, and the superior court did not commit error by allowing Dr. Keen to testify.[5]

---

[5]      In his reply brief, Kavu argues that the superior court erroneously permitted Dr. Keen to serve as a surrogate without ensuring that the State had complied with the statutes governing out-of-state witnesses, A.R.S.

## III.    Denial of Motions for Mistrial.

**¶29**        Kavu contends the superior court improperly denied his motions for mistrial.  He asserts the court should have declared a mistrial after: (1) an officer referred to a matter that had been precluded by a previous court order; and (2) a State expert provided irrelevant, prejudicial testimony.

**¶30**        We review the denial of a motion for mistrial for an abuse of discretion.  *State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000).  In evaluating whether a mistrial is warranted, the superior court "is in the best position to determine whether [improper] evidence will actually affect the outcome of the trial." *Id.*  When improper evidence has been admitted, the superior court should consider: (1) whether the remarks called to the attention of the jurors matters that they would not be justified in considering in determining their verdict; and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks.  *Id.*  Because a "declaration of mistrial is the most dramatic remedy for trial error," it should be granted "only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983).

### A.    Pregnancy Testimony.

**¶31**        On the first day of trial, defense counsel moved to preclude any reference to L.V.'s possible pregnancy (Dr. Ferenc and Dr. Keen reached different conclusions regarding whether changes to L.V.'s reproductive organs indicated an early stage of pregnancy).  The prosecutor agreed that the evidence should be excluded and that R.F. would be admonished accordingly.  Concurring with the parties, the superior court found that evidence of L.V.'s possible pregnancy was inadmissible.  As a precaution, the court told the parties it would provide a curative instructive in the event such testimony "slip[ped] out."

**¶32**        During R.F.'s testimony, no mention was made of L.V.'s possible pregnancy.  When the officer who first responded to the collision scene subsequently testified, however, the prosecutor asked her whether R.F. had reported where he and L.V. were walking, and the officer

---

§ 13-4091 to -4096 (2010).  Because Kavu failed to raise this claim in his opening brief, we do not address it.  *See State v. Guytan*, 192 Ariz. 514, 520, ¶ 15 (App. 1998) (holding issues raised for the first time in a reply brief are waived).

responded, "he indicated . . . that they were . . . traveling north . . . because the female victim was pregnant." Defense counsel immediately objected and the prosecutor asked to approach the bench. At the bench, the prosecutor assured the court that he had no knowledge that the officer "was going to say that."

¶33        Immediately after the bench conference, the superior court instructed the jury as follows:

> Members of the jury, you just heard a statement attributed to a witness about pregnancy. There is no evidence that there was any pregnancy and you will hear no evidence that there was any pregnancy. You are instructed to disregard . . . that statement, not to let it factor into any decision that you may make in this case.

¶34        Notwithstanding the curative instruction, defense counsel moved for a mistrial based on the officer's errant pregnancy testimony. Finding the curative instruction adequately addressed the issue and "fully protected" Kavu, the superior court denied the motion.

¶35        Applying the first prong of the mistrial analysis, the officer's unsolicited testimony clearly presented evidence to the jury that had been precluded by court order. Turning to the second prong, however, the superior court's curative instruction properly limited the possibility that the improper evidence would influence the jury's verdicts. That is, rather than simply striking the officer's testimony as improper, the court informed the jurors that no evidence supported a claim that L.V. was pregnant and therefore they should not consider it. Thus, to the extent the jurors considered the stricken testimony, in contravention of the court's instruction, *see State v. Kuhs*, 223 Ariz. 376, 387 (2010) ("We presume that the jurors follow instructions."), it was with the understanding that R.F.'s statement to the officer was wholly unsubstantiated. Moreover, the jury's acquittal on the count of leaving the scene of a fatal-injury accident demonstrates that the jurors carefully considered the evidence and belies any claim that the jurors may have convicted Kavu simply because the pregnancy testimony made L.V. appear more sympathetic. *See State v. Anderson*, 199 Ariz. 187, 193, ¶ 33 (App. 2000) (reasoning that the jury's acquittal on some charges "undermined" defendant's argument of

prejudice). For these reasons, we cannot say the superior court abused its discretion by denying Kavu's motion for mistrial.[6]

## B.    Retrograde Analysis Testimony.

¶36        Before trial, Kavu moved in limine to preclude the State from offering evidence regarding retrograde analysis.[7] At a hearing on the motion, defense counsel argued that the length of time that had elapsed between the collision and Kavu's subsequent blood draws rendered retrograde analysis unreliable in this case. Consistent with defense counsel's argument, the State conceded that the toxicologist had never previously performed retrograde analysis in a case in which so much time had elapsed. After hearing from the parties, however, the superior court denied the motion in limine, finding Kavu's challenges to the retrograde analysis went to the weight of the evidence, not its admissibility.

¶37        At trial, the toxicologist testified that Kavu's blood was drawn twice following his arrest. The first sample was untestable and the second sample, which was drawn approximately eight hours after the collision, was tested twice, with an average blood alcohol concentration ("BAC") of .113. Explaining that alcohol is metabolized and eliminated through the liver at a constant rate, but individual rates vary, the expert testified that the average elimination rate is .015 per hour.

¶38        Once the prosecutor completed his direct examination of the toxicologist, the superior court invited defense counsel to raise any issues

---

[6]        Kavu asserts, for the first time on appeal, that the prosecutor engaged in misconduct by eliciting the inadmissible pregnancy testimony. Because he failed to object on this basis in the superior court, we review this claim only for fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 20 (2005). Prosecutorial misconduct is "intentional conduct" that the "prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose." *Pool v. Superior Court (State)*, 139 Ariz. 98, 108-09 (1984). Here, the officer's statement was unsolicited, and the prosecutor immediately avowed that he had no foreknowledge that the officer would provide the testimony. On this record, Kavu has failed to demonstrate either misconduct or prejudice.

[7]        Retrograde analysis, or retroactive extrapolation, "is a method by which a person's [blood alcohol concentration] at an earlier point in time is calculated based on his [blood alcohol concentration] from a later blood test." *State ex rel. Montgomery v. Miller*, 234 Ariz. 289, 295, ¶ 5 (App. 2014).

and defense counsel responded that he would handle any concerns on cross-examination. Before commencing cross-examination the following day, however, defense counsel moved to strike the toxicologist's testimony, arguing Kavu's BAC at the time of the second blood draw was so remote from the collision that it was irrelevant to the charges. The prosecutor countered that Kavu's BAC at the time of his arrest, combined with the bar receipts, tended to show that Kavu had a high BAC at the time of the crash and therefore acted recklessly by choosing to drive. Although finding the State had presented sufficient evidence to support an inference that Kavu had consumed alcohol before the collision, the superior court granted defense counsel's motion because the State had failed to present any evidence that retrograde analysis could reliably identify a BAC so remote in time. Concerned that the BAC percentage evidence could nonetheless improperly influence the jury, defense counsel moved for a mistrial. The court denied the motion but instructed the jurors that they could not consider any evidence regarding blood alcohol percentages.

¶39 During closing argument, the prosecutor argued the jury could reasonably infer that Kavu had been intoxicated at the time of the collision based on his alcohol purchases that evening, his odor of alcohol at the time of his arrest, and the presence of alcohol in his blood after the crash. The prosecutor never referenced the toxicologist's percentage testimony. In response, defense counsel argued the toxicologist's test results were irrelevant because the second blood draw was nearly eight hours after the collision and it was possible that Kavu drank alcohol in the interim.

¶40 Although the superior court initially denied Kavu's motion in limine, it ultimately found the State had failed to show that retrograde analysis could reliably be applied to blood drawn nearly eight hours after the relevant time. Striking the toxicologist's percentage testimony accordingly, the court admonished the jurors to disregard it, and consistent with well-settled caselaw, it also instructed the jurors that they could consider the presence of alcohol in Kavu's blood at the time of his arrest. *See Desmond v. Superior Court (State)*, 161 Ariz. 522, 527-28 (1989) ("The proper procedure to be followed when a party offers [a] BAC result into evidence without any relation-back testimony is for the court to admit the portion of the test result that indicates the presence of alcohol in the blood — but not the percentage . . . .").

¶41 Contending this curative instruction provided an insufficient remedy, Kavu argues the delay between the toxicologist's testimony and the court's admonishment allowed the jurors to perform their own retrograde analysis and conclude that Kavu's BAC at the time of the

collision was "almost four times the legal limit."  Even assuming the jurors performed such a calculation, the court expressly instructed them that such percentages could "not factor into any decision that [they] make."  We presume a jury follows a court's instructions, and Kavu has not presented any evidence to overcome that presumption.  *See Newell*, 212 Ariz. at 403, ¶ 68.  For these reasons, the superior court did not abuse its discretion by denying Kavu's motion for mistrial.

## CONCLUSION

¶42      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA

13